JUN - 9 2008

**Clerk,** U.S. District and Bankruptcy Courts

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Ning Ye | ) Case: 1:08-cv-00991 |
| Charles Tun-cheng Yen, and | ) Assigned To : Kennedy, Henry H. |
| Joshua Hope | ) Assign. Date : 6/9/2008 |
|            Petitioners, *pro se* | ) Description: Admn. Agency Review |
|     vs. | ) **PETITION FOR WRIT OF** |
| | ) **MANDAMUS** |
| The Excellency George W. Bush | ) File Number: |
| The President of the United States | ) Oral Argument Prayed |
|            Respondent | ) |

---

### PETITION FOR WRIT OF MANDAMUS TO COMPEL THE PRESIDENT GEOARGE W. BUSH FOR HIS FULL COMPLIANCE OF 1998 INTERNATIONAL RELIGIOUS FREEDOM ACT AND TO ENJOIN HIM FROM ATTENDING OPENING CEREMONY OF 2008 BEIJING SUMMER OLYMPIC GAMES AS PART OF SUCH COMPLIANCE

Comes now, the petitioners, concerned citizens of the United States, respectfully petition to this Honorable Court for a Wirt of Mandamus, which, if rendered, shall order the Respondent, His Excellency George W. Bush, the President of the United States, not to further morally endorse, empower, and legitimize the Chinese Communist Party (CCP), a totalitarian institution, a constantly certified lethal repressor of religious freedom, by attending the Opening Ceremony of the 2008 Summer Olympic Games, which will be held by the People's Republic (PRC) under the CCP, for the vital interests of this nation as well as of the free mankind for the sake of their collective security, also for the sake of the ethical value and the dignity of this great nation.

### INTRODUCTION

In the wake of the most recent bloodbath in the Chinese Communist ruled Tibet targeting peaceful Tibetan Buddhist monks and nuns, having caused at least hundreds of deaths of those chanting monks and nuns, in the CCP driving cultural genocide campaign there; being killed include school children (1); also in the wake of the same regime's constant, systematic, brutal and bloody campaign of religious genocide targeting peaceful religious/spiritual movement, namely, Falun Gong, which having caused 3000 innocent citizens being killed in tortuous killing schemes, coupled with "at least 6000" being sentenced and imprisoned, while 100,000 to

---------------------------------------------------------------------------------

*(1) Tibet: Schoolchildren Among Dead in Chinese Police 'Massacre"* "Times", 03/23/08, Exhibit #1.

125,000 being incarcerated in concentration camps, namely, camps of Reeducation-through-labor(2) after summary judgment, for nothing but their faith in Falun Dafa, a popular religion of peaceful meditation. The U.S. Department of State certified, ***before*** the March 2008 Communist Massacres in bloody repression against peaceful Buddhist monks and nuns in the PRC ruled Tibet and Tibetan regions, that the PRC **government "continued its *severe* cultural and *religious repression* of minorities, with some tightening of control in the XUAR, and *an increased level of religious repression in Tibetan areas*."**(2) Even though efforts to down play all these severe repression has been consistent when the PRC is brought into the picture. In or about March, 2008, as the whole world watches, such an ***an increased level of religious repression in Tibetan areas*"** was turned into bloodbaths in Tibetan areas where at least hundreds, possibly thousands of peaceful Buddhist monks and nuns were massively killed by Beijing regime, host of 2008 Summer Olympic Games.

---

(2)    "Public Falun Gong activity in the country remained negligible,… the government's crackdown against the group continued. In the past, the mere belief in the discipline (even without any public practice of its tenets) sometimes was sufficient grounds for practitioners to receive punishments ranging from loss of employment to imprisonment. … since 1999 at least 6,000 Falun Gong practitioners have been sentenced to prison, more than 100,000 practitioners sentenced to reeducation-through-labor, and *almost 3,000 died from torture while in custody*. Some foreign observers estimated that Falun Gong adherents constituted at least half of the 250,000 officially recorded inmates in reeducation-through-labor camps, while Falun Gong sources overseas placed the number even higher. In the past, many practitioners were detained multiple times." (China: 2007 Human Rights Practice Country Report, p12, U.S. Dept of State, 03/2008, emphasis added)

"The government's human rights record remained poor, and *controls were tightened in some areas, such as religious freedom in Tibetan areas and in the Xinjiang Uighur Autonomous Region* (XUAR); freedom of speech and the media, including the Internet; and the treatment of petitioners in Beijing. As in previous years, citizens did not have the right to change their government. The government tightened restrictions on freedom of speech and the press, particularly in anticipation of and during sensitive events, including increased efforts to control and censor the Internet. Nongovernmental organizations (NGOs), both local and international, continued to face intense scrutiny and restrictions. **The (PRC-added) government continued its *severe* cultural and *religious repression* of minorities, with some tightening of control in the XUAR, and *an increased level of religious repression in Tibetan areas*.** The government stepped up efforts to rid Beijing of petitioners seeking redress for various grievances. Other serious human rights abuses included extrajudicial killings, torture and coerced confessions of prisoners, and the use of forced labor, including prison labor. The government continued to monitor, harass, detain, arrest, and imprison journalists, writers, activists, and defense lawyers and their families, many of whom were seeking to exercise their rights under law. The party and state exercised strict political control of courts and judges, conducted closed trials and carried out administrative detention. Executions often took place on the day of conviction or immediately after the denial of an appeal. A lack of due process and restrictions on lawyers further limited progress toward rule of law. Individuals and groups, especially those deemed politically sensitive by the government, continued to face tight restrictions on their freedom to assemble, their freedom to practice religion, and their freedom to travelon. (Id. P1) Exhibit #2.

On or about November 29, 2006, in addition to countless cases of brutal, constant, and systematic religious persecutions targeting Protestants and Catholics, the Chinese Government boldly implemented its "final solution" by massive executions, having killed at least three co-founders and key congregational leaders of an underground house church movement, namely, "Three Grades of Servats Church", including the founder of the Congregation: Rev. Xu Shuangfu, Rev. Li Maoxing.(3)

The People's Republic of China, under the ruling of Chinese Communist Party, is a totalitarian state exercising the constitutionally mandated "dictatorship of proletariat", the worst, the most lethal, and most enduring one among its kind. The doctrine and practice of "dictatorship of proletariat" were officially abandoned by the Communist Party of the USSR in its Party's 20th Congress held in February 1956AD, and being maintained by Chinese communists as of today and its visible future. Since the World War II, Chinese Communist Party has committed tens of millions murders against all Peoples living within the territories under the "People's Republic". It is the same CCP Party, the same People's Republic of China, that has intentionally and maliciously caused the greatest human casualties of American lives since WWII, in both Korea and Vietnam. It is the same CCP Party, the same People's Republic of China, whose Inter-Continental Blastic Missiles, with multinuclear warheads, adopting, of course, U.S. cutting-edge technology, are aiming at the United States, while its technologically superb nuclear submarines are quietly waiting for hunting strategic targets of this continent. The espionage activities through out the North America has from time to time made this landmass being covered by sea of 5-star red flags.

The People's Republic of China under the ruling Chinese Communist Party does not have sports, organizations, activities, of spirits of sportsmanship, which are "independent from" the total control of a totalitarian state, neither is it independent of financial support directly from the PRC state treasury. Hence the sports under the PRC is not eligible for even as a participating member of the International Olympic Community, for its violation of Article 4 of the Charter; the PRC has been systematically trampling upon, and the most boldly offending the human dignity of all mankind. The most disgusting example is its state mobilized harvesting and trade of human organs heartlessly snatched from its victims under its barrels of guns. Therefore, the sports under the People's Republic of China is a head-on collision with the Charter's champion for promotion of "human dignity"(Art. 2). For all legal aspects, the communist ruled People's

Republic of China may not even eligible for the club membership in participating international Olympic Games, much less legally eligible for hosting the Olympic Games.

As a legal matter, the communist China is still in warring state with the United States, as well as with the United Nations, because at the end of Korean War in 1954, being four of participating warring state, China has yet to enter an official Peace Treaty with the United States and the United Nations, after its tentative "Truce" Agreement.

The United States is the signatory to UN International Convention on Prevention and Punishment against Crimes of Genocide; The United States is the signatory to UN International Convention on Prevention and Punishment against Crimes of Torture. The Government of the United States is a Constitutional Democracy. In 1998, the Congress of the United States passed a landmark enactment, namely, "International Religious Freedom Act", after numerous revisions to balance the pressures from lobbying special interests groups.

Article 2 of the Act (22 USC 6402) defines what "particularly severe violations of religious freedom" is in Act's terminology:

(11) Particularly severe violations of religious freedom.--The term "particularly severe violations of religious freedom" means systematic, ongoing, egregious violations of religious freedom, including violations such as-
(A) torture or cruel, inhuman, or degrading treatment or punishment;
(B) prolonged detention without charges;
(C) causing the disappearance of persons by the abduction or clandestine detention of those persons; or
(D) other flagrant denial of the right to life, liberty, or the security of persons.
Article 403 of the International Religious Freedom Act provides, among others:

"(A)...the President shall review the status of religious freedom in each foreign country to determine whether the government of that country has engaged in or tolerated particularly severe violations of religious freedom in that country during the preceding 12 months or since the date of the last review of that country under this subparagraph, whichever period is longer. The President shall designate each country the government of which has engaged in or tolerated violations described in this subparagraph as a country of particular concern for religious freedom.
(B) Basis of review.--Each review conducted under subparagraph (A) shall be based upon information contained in the latest Country Reports on Human Rights Practices, the Annual Report, and on any other evidence available and shall take into account any findings or recommendations by the Commission with respect to the foreign country."

(3) Rev. Xu Shuangfu, aka, Xu Wenku, is the founder of one of China's largest denomination of underground Protestant House Churches, namely, Three Grades of Servants, and has long been one of the most hated targets to be eliminated by the PRC Government. On or about November 29, 2006, Rev. Xu, together with other 2 house church leaders were sentenced to death for the unfounded charges and the sentence was executed, 15 others were also killed. One was tortured to death. see exhibit #3.

If there are any teeth remained in that Act, these teeth may be seen in the Article 405 of the Act, namely "President Action". Here, among other things, the Act mandates that the Presidential actions are: "The delay or cancellation of one or more scientific exchanges.(6) The delay or cancellation of one or more cultural exchanges. (Section 405 (a)(6) of the Act, [22 USC 6445.]) While Section 405 (a)(7) of the Act, [22 USC 6445.] further provides  the "denial of one or more working, official, or state visits"(4).

(4) The comprehensive laundry list of sanctions set forth in the Act is seen as follows:

" (a) Description of Presidential Actions.--Except as provided in subsection (d), the Presidential actions referred to in this subsection are the following:

(1) A private demarche. (2) An official public demarche. (3) A public condemnation. (4) A public condemnation within one or more multilateral fora. (5) The delay or cancellation of one or more scientific exchanges.(6) The delay or cancellation of one or more cultural exchanges. (7) The denial of one or more working, official, or state visits. (8) The delay or cancellation of one or more working, official, or state visits. (9) The withdrawal, limitation, or suspension of United States development assistance in accordance with section 116 of the Foreign Assistance Act of 1961. (10) Directing the Export-Import Bank of the United States, the Overseas Private Investment Corporation, or the Trade and Development Agency not to approve the issuance of any (or a specified number of ) guarantees, insurance, extensions of credit, or participations in the extension of credit with respect to the specific government, agency, instrumentality, or official found or determined by the President to be responsible for violations under section 401 or 402. (11) The withdrawal, limitation, or suspension of United States security assistance in accordance with section 502B of the Foreign Assistance Act of 1961. (12) Consistent with section 701 of the International Financial Institutions Act of 1977, directing the United States executive directors of international financial institutions to oppose and vote against loans primarily benefiting the specific foreign government, agency, instrumentality, or official found or determined by the President to be responsible for violations under section 401 or 402. (13) Ordering the heads of the appropriate United States agencies not to issue any (or a specified number of ) specific licenses, and not to grant any other specific authority (or a specified number of authorities), to export any goods or technology to the specific foreign government, agency, instrumentality, or official found or determined by the President to be responsible for violations under section 401 or 402, under-- (A) the Export Administration Act of 1979; (B) the Arms Export Control Act; (C) the Atomic Energy Act of 1954; or (D) any other statute that requires the prior review and approval of the United States Government as a condition for the export or reexport of goods or services. (14) Prohibiting any United States financial institution from making loans or providing credits totaling more than $10,000,000 in any 12-month period to the specific foreign government, agency, instrumentality, or official found or determined by the President to be responsible for violations under section 401 or 402. (15) Prohibiting the United States Government from procuring, or entering into any contract for the procurement of, any goods or services from the foreign government, entities, or officials found or determined by the President to be responsible for violations under section 401 or 402. (b) Commensurate Action.--Except as provided in subsection (d), the President may substitute any other action authorized by law for any action described in paragraphs (1) through (15) of subsection (a) if such action is commensurate in effect to the action substituted and if the action would further the policy of the United States set forth in section 2(b) of this Act. The President shall seek to take all appropriate and feasible actions authorized by law to obtain the cessation of the violations. If commensurate action is taken, the President shall report such action, together with an explanation for taking such action, to the appropriate congressional committees. (c) Binding Agreements.--The President may negotiate and enter into a binding agreement with a foreign government that obligates such government to cease, or take substantial steps to address and phase out, the act, policy, or practice constituting the violation of religious freedom. The entry into force of a binding agreement for the cessation of the violations shall be a primary objective for the President in responding to a foreign government that has engaged in or tolerated particularly severe violations of religious freedom." (See 22 USC 6445) **President George W. Bush, who is prominent for advocacy of "religious freedom" has done little or completely nothing during his 7-year presidency, in reference to the People's Republic, in the eyes of the Act.**

Petitioners have highly acclaimed to President George W. Bush for his long claimed legacy for advocating religious freedom, unfortunately, in reflection of what the 1998 Act mandates, the same President has virtually done nothing, again, nothing, in response to the systematic, brutal, lethal repression of religious freedom in the People's Republic. President George W. Bush has virtually remained silent, issued neither private demarche, nor public condemnation, in response to all such aggravated religious persecutions taking place during his two-term presidency: systematic, accelerated killings and other forms of brutal persecution against Falun Gong practitioners inside China; brutal religious persecution against Tibetan Buddhists in form as what His Holiness Dalai Lama called: "cultural genocide" in Tibet; Most recent bloodbath as massive killing against peaceful chanting Buddhist monks and nuns in Tibet; Massive and collective killing against underground Christian church leaders in November 2006. Petitioners have also noticed that in the wake of the most recent bloodbath of the lethal religious persecution as massive, and genocidal killing of Tibetan Buddhists in the area of Tibet under the Chinese Communist brutal ruling, in the wave after wave condemnation by other parts of the international community, the Bush Administration has virtually kept silent viv-a-vis all these on-going egregious religious persecution, except for calling for "dialogues" between his Holiness Dalai Lama and the Politburo of the Chinese Communist Party, a hollow political gestures, camouflaging the CCP's ceaseless brutal crimes against humanity. To be most offensive against the conscience of the People of the United States, against the conscience of free mankind, President George W. Bush has persistently vowed to participate as the world's most honored dignitary, in the opening ceremony of 2008 Summer Olympic Games held in Beijing China, readily lending the fullest moral endorsement to Beijing butcher by giving the latter a free license to kill more religious believers. President George W. Bush's attendance of 2008 Summer Olympic Games in Beijing, communist ruled People's Republic, a replica of 1936 Nazi Berlin Olympics, of worse pattern, as a prima facia violation of 1998 International Religious Freedom Act. Therefore, as the last resort, we, the undersigned Petitioners, as U.S. citizens of conscience, respectfully pray, that this Honorable Court to issue an injunction to legally bar the Respondent from attending 2008 Beijing Olympic Games. Petitioners have also noticed that the Respondent President George W. Bush repeatedly states that the 2008 Summer Olympic Games is just something addressing "sports", rather than a political event, therefore, his attendance should not be politicized. We the petitioners assume the Respondent's allegation

6

were right, henceforth, this case may not be thrown out of the court for being a "political question", because the substance of the question, following and concurring to the Respondent's claim, is non-political. As matter of both law and fact, the question addressed in this case is mostly moral, ethical and legal, rather than "political".

**THE PARTIES**

Petitioner Ning Ye, is a U.S. Citizen of Chinese origin, currently residing at 201 Mass Avenue, NE, Apt. 202, Washington, DC 20002;

Petitioner Charles Tun-Cheng Yen, is a U.S. Citizen of Chinese origin, currently residing at 134-38 Maple Avenue, Apt. 3K, Flushing, New York 11355;

Petitioner Joshua Hope, is a U.S. Citizen of Chinese origin, currently residing at 47 Fulton Street, Apt. 17E, New York, NY 10003;

Respondent George W. Bush, is a U.S. Citizen, holding the official position as of the President of the United States, currently residing at the White House, 1600 Pennsylvania Avenue, NW, Washington, DC 20530..

## JURISDICTION AND VENUE

The subject matter jurisdiction is found in the Mandamus Act, 28 USC 1361, Action to Compel an Officer of the United States to Perform His Duty, U.S. District Courts have original jurisdiction. Jurisdiction is also found in Federal Question jurisdiction pursuant to 28 U.S.C. § 1331 where United States Federal Court has subject matter jurisdiction to hear a civil case here Petitioners allege violations of the Constitution, laws, treaties of the United States.

Article III of the United States Constitution permits federal courts to hear such cases, so long as the United States Congress passes a statute to that effect. However, when Congress passed the Judiciary Act of 1885. The statute is now found at 28 U.S.C. § 1331: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

The venue is proper in this judicial district under 28USC 1391(a) because the subject matter claimed arose herein the District of Columbia, as well as all other States or territories through out the nation and defendant's both residence and his principal place of business is situated in the District of Columbia, *i.e.*, this Judicial District.

**LAWS, PRECEDENTS AND AUTHORITIES**

7

This Honorable Court has broad latitude of discretional jurisdiction concerning writ of mandamus is found pursuant to 28 USC 1651(a) ((Work v. Rives 267 US 175, 177 (1925))   The question addressed in this instant petition is concerned about the integrity of the U.S. government as a government of law, rather than a government of "President".   To consciously, subconsciously, or unconsciously lend helping hands in such a readiness to communist China in moral support of a lethal totalitarian regime by endorsing its domestic propaganda campaign by exploiting its host of Olympic Games, in addition to constant inflow of hundreds of billions of dollars each year as all kinds of financial subsidies in helping stabilizing the totalitarian communist regime, is a suicidal action in a long run against the Nation of the United States. Such attendance by the Respondent, vis-à-vis Beijing's "severe violation of religious freedom" as defined by Article 2 of the 1998 Act, given to Tibetan massacres and other most severe abuses, will grossly violate the International Religious Freedom Act.   Due to apparent lack of other effective way to prevent such imminent wrongs from happening in such a short timing, we the petitioners have to seek for "extraordinary judicial remedy" by resorting to Federal law and International treaties.   Such "extraordinary remedies can then be used in exceptional circumstances of peculiar emergency" (LaBuy v. Howes Leather Co. 352 US 249-1957) U.S. v. McGarr 461 F2d1, 7th Cir, 1972) ...or in case of failure of justice, usurpation of judicial power (Schlagenhauf v. Holder 379 US 104 (1964)).   The substantive law applicable in this instant case, for the most relevant part and for limited purpose of this legal action, among others, is 1998 International Religious Freedom Act (22 USC 6402-6445, *et seq.*).

**ANALYSIS**

When taking the office, President George W. Bush, like all his predecessors, swore under the oath that he would faithfully enforce and defend the Constitution and the Federal law of the United States.  Being integral part of our Federal law system, the Congressional Enactment, namely, 1998 International Religious Freedom Act needs to be obediently enforced by the present Administration.  Such Federal legislature, while having been in place for a whole decade, in parallel track with the Present Administration's systematic silence and omission, should not be in any circumstances treated as a void.

Since the International Olympics Committee, in complete disregard of its Charter governing Fundamental Principles of Olympism, rewarded the Beijing regime with its sponsorship of 2008 Summer Games regardless for the latter's apparent disqualification under

Article 1, 2, 4 and 5 (5) of the Charter governing Fundamental Principles of Olympism, it has been certified that the latter has committed and accelerated what the 1998 Act specified as "particularly severe violations of religious freedom".(6)  Such "particularly severe violations of religious freedom", which the 1998 Enactment expressively prohibited, reached its climax when the PRC government committed bloodbath after bloodbath in numerous massacres against Tibetan Buddhists in different Tibetan areas this past March.  Under such drastically aggravated circumstances, President George W. Bush, after his 7-year persistent silence as to the world's worst bloodstain religious oppressor, totalitarian Beijing Regime, readily and unconditionally gives his high profile, raw model type, moral endorsement to such an infamous regime, by offering to personally attend the Opening Ceremony of 2008 Games in Beijing, PRC, is in head-on collision with the 1998 International Religious Freedom Act, not only in terms of its specific provisions, but in terms of its founding principles and jurisprudential philosophy for its entirety. The interests of justice, for its integrity, should request the Administration act or omit by restraining itself within the single and right track framed by this Nation's Constitution and Federal law system.  The Respondent should also be reminded to maintain loyal to his own oath to defend the integrity of U.S. Constitution and U.S. Federal law when taking the office.

While mobilizing international boycott of 1936 Nazi Berlin Olympic Game, the Committee on Fair Play in Sports of New York pointed out: "…Sport is prostituted when sport loses its independence and democratic character and becomes a political institution….Nazi Germany is endeavoring to use the 11[th] Olympiad to serve the necessities and interests of the Nazi Regime rather than the Olympic ideals" (7).   These comments best reflects the deep nature of totalitarian institution's enthusiasm, as ulterior motive, in hosting Olympic Games, Fascism or Communism from Berlin in 1936 to Beijing in 2008, alike.   Reflected in the mirror of Man's painful historical lessons, we have all witnessed that "the Olympics seem to have given the Beijing regime a new incentive, and excuse, to hasten its abuses of citizens' rights" (U.S. based Falun Dafa Information Center, see World Politics Review Exclusive, 04/01/2008, see attachment) The same source cited that 1878 new arrests of FLG practitioners from 29 provinces have been made and cash rewards up to $360 were being offered to any informant who helps the

------------------------------------------

(5) Please see Charter governing Fundamental Principles of Olympism, Exhibit #4;
(6) "World Politics Review Exclusive" 04/01/2008;  Exhibit #5.
(7) Berlin 1936: Nazi Olympics, Holocaust Memorial Museum, Exhibit #6.

PRC government to identify Falun Gong members. According to Amnesty International, all these were couched as crucial to "successfully holding the 2008 Summer Olympic Games. Under the same "incentive", genocidal crimes of bloodbath targeting Tibetan Buddhists, a well documented "particularly severe violations of religious freedom", followed with widely spreading epidemic of communist incited ultra-national public syndrome, symbolized with the sea of five-star flags and the "patriotic" demonstrators' highly raising, pointing-to-sky middle fingers, a seemingly novel national logo of the "People's Republic", has since been marching forward through out of the world, well beyond its national border.

If sport were the only business to be prostituted, that might be the price barely affordable by free mankind. If along with sport, here is such something more vital as ethical integrity of the Administration, conscience, morality, integrity of constitutional democracy, value inheritance, leadership in world affairs, in addition to our long-run strategic national security interests, that might not be the price this generation can afford. Petitioners in this instant case has been deeply trouble to see the long standing parallel tracks as part of the reality in relation to this instant case: One track, i.e., the institutional legal order: the Congress passed 1998 International Religious Act, which imposes certain legal obligations for the Executive Branch to fulfill in case of "particularly severe violations of religious freedom" in a foreign country; co-exists with the Parallel track of the Administration's complete disregard and total inaction, or ultra-enthusiastic action on the opposite direction. The same happened on the side of International Olympic Committee. One track, i.e., Charter governing Fundamental Principles of Olympism, at least for its Article 1, 2, 4, and 5, in place, co-exists with the Committee's acts and behavior in apparent opposite direction, by not only offering the totalitarian Beijing regime membership to Olympic community, but going wild to offer the regime to be the host of 2008 International Summer Olympic Games.

With all these developments, here comes a high time to resort to the judicial branch of this checking and balancing institute of constitutional democracy, its final defender, to seek for injunctive relief to bar the Administration's unconscionable, unethical decision having President George W. Bush attend the Opening Ceremony of 2008 Beijing Summer Olympic Games, for such a decision is a prima facia violation of 1998 International Religious Freedom Act, vis-à-vis

government of the PRC's certified "particularly severe violations of religious freedom", before, during and after March 2008.   For the purpose of record, all participants of this instant case might be adjudged by generations yet to come.

### RELIEF PRAYED

Petitioners respectfully pray that this Honorable Court to issue an injunction to bar the Respondent from attending the 2008 Summer Olympic Games.  As provisional relief, Petitioners further respectfully pray that this Honorable Court to render a temporary restraining order to bar the Respondent, in person, from visiting the People's Republic of China before September 2008, pursuant to Article 405 of the International Religious Freedom Act.  Petitioners further pray that this Honorable Court to issue a writ commanding the Administration to seriously implement the International Religious Freedom Act  for its integrity in its relation to communist China, unless the Respondent raises formal and official defense of "national interests exceptions" before this Honorable Court. Petitioners also seek for such other relief as this Honorable Court finds it appropriate.  Petitioner prays for fast track calendar because one of the petitioners, Joshua Hope is now 88 years of age.

ORAL ARGUMENT IS ALSO RESPECTFULLY PRAYED.

## CONCLUSION

Wherefore, in the above light, Petitioners respectfully pray that the Writ of Mandamus be kindly issued against the Respondent.

Respectfully submitted

Ning Ye, the petitioner, *pro se*
201 Mass Avenue, NE, #202
Washington, DC 20002
Telephone: 301-641-7345
Fax: 202-828-4130
Email: ynyale@aol.com

Charles Tun-cheng Yen, Petitioner, *pro se*
38 Maple Avenue, Apt. 3K
Flushing, New York 11355
Telephone/Fax: 718-445-0639

Joshua Hope, co-petitioner, *pro se*
47 Fulton Street, Apt. 17E
New York, NY 10003
Telephone: 212-766-0792



You've heard of Netflix...
Now try us for FREE

Iconic Films
Book now for What Ever
Happened to Baby Jane? 2 for 1
screening tonight

**TIMES**
News Site of the Year | The 2008 Newspaper Awards

" No one wants a brain surgeon with
the shakes " Anel Leve
Send your views

NEWS   COMMENT   BUSINESS   SPORT   LIFE & STYLE   ARTS & ENTERTAINMENT   LUXX          ARCHIVE   OUR PAPERS   JOBS & CLASSIFIEDS

UK NEWS   WORLD NEWS   POLITICS   ENVIRONMENT   WEATHER   TECH & WEB   TIMES ONLINE TV   PHOTO GALLERIES   TOPICS   MOBILE

RSS

Where am I?   Home   News   World News   **Asia News**                                    SHOP   MY PROFILE   SITEMAP

From The Sunday Times
March 23, 2008

# Tibet: schoolchildren among dead in Chinese police 'massacre'



IMAGE 1 of 4

Dean Nelson in Kathmandu

The monks of Kirti monastery in Aba, Sichuan, western China, are said to have found a 16-year-old schoolgirl among up to 23 Tibetan protesters killed when Chinese police opened fire last Sunday

Lhundup Tso, the youngest reported victim of the Chinese crackdown, still had her school satchel strapped to her back Her body was taken to the monastery with the other dead to document what Tibetan officials claim was a massacre

They fear it may be one of several carried out by Chinese armed police in an attempt to put down the largest Tibetan uprising in almost 20 years.

Tso is said to have been among 2,500 Tibetans, led by monks, who marched towards the local government headquarters chanting, "Long live the Dalai Lama," and other independence slogans. They set off at 11.30am and were confronted by about 200 members of the People's Armed Police, in combat kit and carrying machineguns.

**RELATED LINKS**
Ethnic repression masterminded by faceless trio

**MULTIMEDIA**
London protest in support of Tibetans

According to the Tibetan Centre for Human Rights and Democracy, which said last week that it had confirmed 23 deaths, the police opened fire to disperse the crowd.

The centre's director, Urgen Tenzin, said the shooting had caused panic and a stampede Tso was found lying face up on the ground, but monks who took her body to the monastery said she had been shot in the back of the head

Lying nearby was her fellow pupil at Aba Tibetan middle school, a 17-year-old named Norbu, who had been taken to the monastery and photographed along with five other victims. His thin torso was smeared with blood and there was a bullet hole in his chest.

**EXPLORE WORLD NEWS**
IRAQ NEWS
US & AMERICAS NEWS
EUROPE NEWS
MIDDLE EAST NEWS
ASIA NEWS
AFRICA NEWS
IRELAND NEWS

**TIMES RECOMMENDS**
US candidates will aim for same voters
Zimbabwe's 'military coup by stealth'
Bush begins farewell tour of Europe

**TOKYO STABBINGS**



Knifeman stuns nation with deadly killing spree in shopping hub
Slide Show

**PICTURES OF THE WEEK**



A selection of the best images from around the world
Slide Show

**KOREA BEEF PROTESTS**





Exhibit #1

08 0991

FILED
JUN - 9 2008
Clerk, U.S. District and
Bankruptcy Courts



# U.S. DEPARTMENT of STATE

## China (includes Tibet, Hong Kong, and Macau)

Country Reports on Human Rights Practices - 2007
Released by the Bureau of Democracy, Human Rights, and Labor
March 11, 2008

(The section for Tibet, the report for Hong Kong, and the report for Macau are appended below )

The People's Republic of China (PRC) is an authoritarian state in which, as specified in its constitution, the Chinese Communist Party (CCP) is the paramount source of power  Party members hold almost all top government, police, and military positions  Ultimate authority rests with the 25-member political bureau (Politburo) of the CCP and its nine-member standing committee. Hu Jintao holds the three most powerful positions as CCP general secretary, president, and chairman of the Central Military Commission. The party's authority rested primarily on the government's ability to maintain social stability, appeals to nationalism and patriotism; party control of personnel, media, and the security apparatus, and continued improvement in the living standards of most of the country's 1 3 billion citizens  Civilian authorities generally maintained effective control of the security forces

The government's human rights record remained poor, and controls were tightened in some areas, such as religious freedom in Tibetan areas and in the Xinjiang Uighur Autonomous Region (XUAR); freedom of speech and the media, including the Internet, and the treatment of petitioners in Beijing  As in previous years, citizens did not have the right to change their government. The government tightened restrictions on freedom of speech and the press, particularly in anticipation of and during sensitive events, including increased efforts to control and censor the Internet. Nongovernmental organizations (NGOs), both local and international, continued to face intense scrutiny and restrictions  The government continued its severe cultural and religious repression of minorities, with some tightening of control in the XUAR, and an increased level of religious repression in Tibetan areas  The government stepped up efforts to rid Beijing of petitioners seeking redress for various grievances. Other serious human rights abuses included extrajudicial killings, torture and coerced confessions of prisoners, and the use of forced labor, including prison labor  The government continued to monitor, harass, detain, arrest, and imprison journalists, writers, activists, and defense lawyers and their families, many of whom were seeking to exercise their rights under law. The party and state exercised strict political control of courts and judges, conducted closed trials and carried out administrative detention. Executions often took place on the day of conviction or immediately after the denial of an appeal  A lack of due process and restrictions on lawyers further limited progress toward rule of law. Individuals and groups, especially those deemed politically sensitive by the government, continued to face tight restrictions on their freedom to assemble, their freedom to practice religion, and their freedom to travel  The government continued its coercive birth limitation policy, in some cases resulting in forced abortion and sterilization.

The government failed to protect refugees adequately, and the forced repatriation of North Koreans continued to be a grave problem. Serious social conditions that affected human rights included endemic corruption, trafficking in persons, and discrimination against women, minorities, and persons with disabilities  In the XUAR, trials of Uighurs charged with separatism continued.

The government pursued some important criminal and judicial reforms  In January the country's highest court, the Supreme People's Court (SPC), reassumed the death penalty review power from provincial courts in cases handed down for immediate execution, a power that had devolved to provincial high courts in 1980. Also in January the government implemented temporary rules for foreign journalists, which eliminated the requirement for journalists to seek approval from authorities before conducting interviews. The Foreign Correspondents Club of China (FCCC) reported that although the regulations improved overall reporting conditions for foreign journalists, problems with enforcement of the regulations remained a challenge, and there were over 180 reports of interference, some of which included plainclothes thugs intimidating or physically assaulting foreign journalists.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From

a. Arbitrary or Unlawful Deprivation of Life

During the year the government and its agents reportedly committed arbitrary or unlawful killings. No official statistics on deaths in custody were available. On January 5, 18 persons were killed and 17 were arrested during a raid at a location in the XUAR that Chinese officials called a terrorist training base  On February 27, Xu Hongmei and Shen Zili, two women who were arrested in January for Falun Gong activities, died after they were reportedly tortured by security forces. On March 22, local procuracy officials detained a Guilin judge, Li Chaoyang, on bribery allegations  After family members learned that Li was dead, they examined the body and found that Li was missing several teeth and had a stitched-up face wound. On May 28, local procuracy officials detained Lianyungang City electric utility official Liang Xuping, and Liang subsequently died  Liang's body was bruised, but officials claimed Liang died of a heart attack

There were no developments in the investigation of the 2006 shooting of Tibetan nun Kelsang Namtso, who was shot and killed when People's Armed Police at the Nangpa La pass fired at a group of approximately 70 Tibetans, or the 2005 police killing of at least three protesters in Dongzhou Village, Guangdong Province.

Trials involving capital offenses sometimes took place under circumstances involving severe lack of due process and with no meaningful appeal  Some executions took place on the day of conviction or failed appeal. Executions of Uighurs whom authorities accused of separatism, but which some observers claimed were politically motivated, were reported. On February 8, authorities executed Ismail Semed, an ethnic Uighur from the XUAR, following 2005 convictions for "attempting to split the motherland" and other counts related to possession of firearms and explosives.

b. Disappearance

Human rights defender Gao Zhisheng, who was detained and questioned several times over the past two years, was last seen September 22 in the presence of municipal security officials at his Beijing home. Gao wrote a letter addressing human rights in China to a foreign government, which became public in the days preceding his disappearance. In September a group of 21 farmers reportedly disappeared in Beijing after traveling from Chengdu to petition the government in a land compensation case. Tibetan Web master Tsewangnorbu has been missing since Gansu province security authorities shut down his Web site in 2005

At year's end the government still had not provided a comprehensive, credible accounting of all those killed, missing, or detained in connection with the violent suppression of the 1989 Tiananmen demonstrations.

c  Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law forbids prison guards from extracting confessions by torture, insulting prisoners' dignity, and beating or encouraging others to beat prisoners. In November 2006 the Supreme People's Procuratorate (SPP) Deputy Secretary Wang Zhenchuan acknowledged that illegal interrogation by "atrocious conducts" caused ...

**08 0991**

**FILED**

JUN - 9 2008

Clerk, U.S. District and
Bankruptcy Courts

local judicial practice throughout China and that almost all mishandled criminal cases in the previous year involved the "shadow of illegal interrogation." Wang estimated that at least 30 wrongful convictions were issued each year because of torture. In addition there continued to be frequent reports that police and other elements of the security apparatus employed widespread torture and degrading treatment when dealing with some detainees and prisoners.

During the year there were reports that officials used electric shocks, beatings, shackles, and other forms of abuse. In February and March legal advisor and rights activist Guo Feixiong (also known as Yang Maodong) reportedly suffered repeated torture, including electric shocks and being tied to a "tiger bench" for four hours. When on a "tiger bench" the victim reportedly sits on a bench with legs tied stretched out straight on the bench and hands tied behind a vertical back support. Bricks or other hard objects are then pushed under the victim's legs or feet, causing the legs to bend upwards, sometimes until they break. The abuse reportedly drove Guo to attempt suicide. In June Guo Feixiong's wife reportedly sent an open letter to UN Special Rapporteur on Torture Manfred Nowak detailing her husband's abuse in prison, which included beatings with electric police batons when Guo refused to make a confession. On September 29, rights defender Li Heping reportedly was detained for six hours by plainclothes assailants who beat and tortured him with cattle prods before releasing him. In October a recently released cellmate of land activist Yang Chunlin reported that Yang was tortured in prison, including having his legs and arms stretched and chained to four corners of an iron bed for days.

In June 2006 authorities detained and beat Alim and Ablikim, the sons of prominent Uighur human rights activist Rebiya Kadeer, and Alim reportedly confessed to the charges against him after being tortured by security officials. In 2006 Beijing-based petitioner leader Ye Guozhu reportedly was tortured and abused in prison, including beatings with electric batons, suspension from the ceiling by his arms, and shackled and forced to sit in extreme positions for extended periods of time. In June the Guangzhou Intermediate Court convicted a police officer of beating to death a fraud suspect, Wang Weiqing, in 2002. Prosecutors determined that 40 officers in the local public security bureau (PSB) conspired to conceal the beating. Many alleged acts of torture occurred in pretrial criminal detention centers or reeducation-through-labor centers.

In March 2006 UN Special Rapporteur Nowak reaffirmed earlier findings that torture, although on a decline--particularly in urban areas--remained widespread, and that procedural and substantive measures were inadequate to prevent torture. Nowak reported that beatings with fists, sticks, and electric batons continued to be the most common forms of torture. He also found that prisoners continued to suffer cigarette burns, prolonged periods of solitary confinement, and submersion in water or sewage, and that they were made to hold extreme positions for long periods, were denied medical treatment, and were forced to do hard labor. Death row inmates were shackled or handcuffed 24 hours per day and systematically abused to break their will and force confessions. According to Nowak, officials specifically targeted for abuse house church groups, Falun Gong adherents, Tibetans, and Uighur prisoners. Nowak reported that Falun Gong practitioners accounted for 66 percent of victims of alleged torture while in government custody. Since the crackdown on Falun Gong began in 1999, estimates of the number of Falun Gong adherents who died in custody due to torture, abuse, and neglect ranged from several hundred to a few thousand.

Sexual and physical abuse and extortion occurred in some detention centers. Falun Gong activists reported that police raped female practitioners, including in 2005 at the Dongchengfang police station in Tunzhou City, Hebei Province, where two women were allegedly raped while in detention.

According to foreign researchers, the country had 20 ankang institutions (high-security psychiatric hospitals for the criminally insane) directly administered by the Ministry of Public Security. Persons committed to these institutions had no mechanism for objecting to public security officials' determinations of mental illness. Some dissidents, persistent petitioners, and others were housed with mentally ill patients in these institutions. Patients in these hospitals were reportedly given medicine against their will and forcibly subjected to electric shock treatment. The regulations for committing a person to an ankang facility were not clear. Political activists, underground religious believers, persons who repeatedly petitioned the government, members of the banned China Democratic Party (CDP), and Falun Gong adherents reportedly were incarcerated in such facilities during the year. Activists sentenced to administrative detention also reported they were strapped to beds or other devices for days at a time, beaten, forcibly injected or fed medications, and denied food and use of toilet facilities.

From January to May prosecutors nationwide investigated 2,808 cases of dereliction of duty and infringement of rights by officials, involving 3,470 persons. This represented an 8.3 percent increase in cases from the same period in 2006. In 2006 the SPP and the courts issued directives to eliminate interrogation through torture. By September 2,829 procuratorates throughout China had begun audio and video taping police interrogations, in some cases to prevent coerced confessions. Beginning in September Beijing and several other cities launched campaigns providing that police officers who obtain coerced confessions can be suspended.

Prison and Detention Center Conditions

According to 2005 official statistics, the Ministry of Justice administered more than 700 prisons with a population of more than 1.8 million inmates. In addition 30 jails for juveniles held approximately 22,000 juvenile offenders. The country also operated hundreds of administrative detention centers, which were run by security ministries and administered separately from the formal court system.

Conditions in penal institutions for both political prisoners and common criminals generally were harsh and degrading. Prisoners and detainees often were kept in overcrowded conditions with poor sanitation. Inadequate prison capacity was an increasing problem in some areas. Food often was inadequate and of poor quality, and many detainees relied on supplemental food and medicines provided by relatives; some prominent dissidents were not allowed to receive such goods.

Many inmates in penal and reeducation-through-labor facilities were required to work, with minimal or no remuneration. In some cases prisoners worked in facilities directly connected with penal institutions; in other cases they were contracted to nonprison enterprises. Former prison inmates reported that workers who refused to work in some prisons were beaten. Facilities and their management profited from inmate labor.

In January Ministry of Health spokesman Mao Qunan reportedly acknowledged that the government harvested organs from executed prisoners. On May 1, new regulations came into effect that include a ban on the trade of human organs and on live organ transplants from persons under the age of 18. The regulations also stipulate that the donation of human organs for transplant should be free and voluntary. However, the new regulations make no specific reference to the extraction of organs from death penalty prisoners.

Adequate, timely medical care for prisoners remained a serious problem, despite official assurances that prisoners have the right to prompt medical treatment. On July 1, Shanghai petitioner Chen Xiaoming died the day he was released from custody on medical parole. According to media reports, authorities refused earlier requests by the family for medical parole and only allowed the family to provide Chen with medication one time during his detention. Labor activist Yao Fuxin remained in prison in very poor health, and authorities denied his family's request for medical parole. Labor union leader Wang Sen remained in prison and was also reportedly in poor health. Wang applied for medical parole but was also denied. During the year cyber dissident He Depu's health reportedly deteriorated significantly due to medical neglect and maltreatment. However, prison officials stated that his condition would have to deteriorate further before he could be considered for medical parole. Journalist Ching Cheong's health also deteriorated, and in August the Hong Kong Journalists Association sent an open letter to President Hu Jintao urging authorities to grant him medical parole. Many other prisoners with serious health concerns remained in prison at year's end. Prison officials often denied privileges, including the ability to purchase outside food, make telephone calls, and receive family visits, to those who refused to acknowledge guilt.

Conditions in administrative detention facilities, such as reeducation-through-labor camps, were similar to those in prisons. Beating deaths occurred in administrative detention and reeducation-through-labor facilities.

The law requires juveniles to be held separately from adults, unless facilities are insufficient. In practice children sometimes were held with adult prisoners and required to work. Political prisoners were segregated from each other and placed with common criminals, who sometimes beat political prisoners at the instigation of guards. Newly arrived prisoners or those who refused to acknowledge committing crimes were particularly vulnerable to beatings.

The government generally did not permit independent monitoring of prisons or reeducation-through-labor camps, and prisoners remained inaccessible to local and international human rights organizations, media groups, and the International Committee of the Red Cross (ICRC).

China (includes Tibet, Hong Kong, and Macau)                                                                     Page 3 of 37

d  Arbitrary Arrest or Detention

Arbitrary arrest and detention remained serious problems  The law permits police and security authorities to detain persons without arresting or charging them  Because the government tightly controlled information, it was impossible to determine accurately the total number of persons subjected to arbitrary arrest or detention  According to 2005 official statistics, 500,000 persons were held in 310 reeducation-through-labor camps  In 2004 special administrative detention facilities held more than 350,000 offenders

Role of the Police and Security Apparatus

The security apparatus is made up of the Ministries of State Security and Public Security, the People's Armed Police, the People's Liberation Army (PLA), and the state judicial, procuratorial, and penal systems  The Ministries of State Security and Public Security and the People's Armed Police were responsible for internal security  SPP and SPC officials admitted that courts and prosecutors often deferred to the security ministries on policy matters and individual cases  The SPP was responsible for the investigation of corruption and duty crimes  The PLA was responsible for external security but also had some domestic security responsibilities.

The Ministry of Public Security (MPS) coordinates the country's law enforcement, which is administratively organized into local, county, provincial, and specialized police agencies  Recent efforts have been made to strengthen historically weak regulation and management of law enforcement agencies, however, judicial oversight was limited, and checks and balances were absent  Corruption at the local level was widespread  Police officers reportedly coerced victims, took individuals into custody without just cause, arbitrarily collected fees from individuals charged with crimes, and mentally and physically abused victims and perpetrators

The SPP acknowledged continuing widespread abuse in law enforcement  In July 2006 the SPP issued new standards for prosecuting official abuses of power  Domestic news media reported the convictions of several public security officials who had beaten to death suspects or prisoners in their custody  Nonetheless, investigation of misconduct typically only came in response to publicity, public pressure, and persistent efforts by relatives of victims to petition the government  In July 2006 an SPP spokesperson said there were many abuse of power cases that the procuratorates did not dare handle.

Arrest and Detention

Public security organs do not require court-approved warrants to detain suspects under their administrative detention powers  After detention the procuracy can approve formal arrest without court approval  According to the law, in routine criminal cases police can unilaterally detain persons for up to 37 days before releasing them or formally placing them under arrest  After a suspect is arrested, the law allows police and prosecutors to detain a person for up to seven months while public security organs further investigate the case  Another one and one-half months of detention are allowed where public security organs refer a case to the procuratorate to decide whether to file charges  If charges are filed, authorities can detain a suspect for an additional one and one-half month period between filing and trial  However, in practice the police sometimes detained persons beyond the time limits stipulated by law  In some cases, investigating security agents or prosecutors sought repeated extensions, resulting in pretrial detention of a year or longer  The trial of New York Times researcher Zhao Yan was delayed almost two years before finally convening in June 2006  It was uncertain how many other prisoners were similarly detained  The criminal procedure law allows detainees access to lawyers before formal charges are filed, although police often limited such access.

The criminal procedure law requires a court to provide a lawyer to a defendant who is blind, deaf, mute, a minor, or may be sentenced to death, if the defendant has not already retained a lawyer, whether or not the defendant is indigent  Courts may also provide lawyers to other criminal defendants who cannot afford them, although courts often do not appoint counsel in such circumstances.

Detained criminal suspects, defendants, their legal representatives, and close relatives are entitled to apply for bail; however, in practice few suspects were released on bail pending trial  The government used incommunicado detention  The law requires notification of family members within 24 hours of detention, but individuals often were held without notification for significantly longer periods, especially in politically sensitive cases  Under a sweeping exception, officials were not required to provide notification if doing so would "hinder the investigation" of a case  In some cases police treated those with no immediate family more severely.

Administrative detention was frequently used to intimidate political activists and prevent public demonstrations  During the year individuals were assigned to administrative detention without charge, trial, or judicial review  Efforts to reform or abolish the reeducation-through-labor system remained stalled  In March 2006 the New Public Order Administrative Punishment Law went into effect, which provides for review of detention decisions but also creates 165 new offenses subject to administrative punishment  According to reports there were concerns that authorities were expanding the use of punitive administrative detention rather than reforming or abolishing it.

In May 2006 the SPP acknowledged that unlawful extended detentions remained a problem and that authorities misused legal provisions to hide this. A nationwide survey found that, between January 2003 and September, 33,643 persons were detained longer than provided by law at some stage of the investigation, prosecution, or trial process. A number of individuals in politically sensitive cases were held for periods longer than the time authorized by law  In some cases investigating security agents or prosecutors sought repeated extensions, resulting in pretrial detention of a year or longer

Citizens who were reportedly detained with no or severely delayed notice included Pan Blue Alliance leader Sun Buer, who police in May took from his home and held incommunicado. On August 24, PSB officials arrested writer and rights activist Lu Gengsong following publication of articles critical of authorities. Lu was held in detention for more than a month, and on September 29 he was formally charged with "inciting subversion of state power." On August 21, activist Yue Ming was detained for two weeks without charge for posting online messages calling a meeting for people upset over high housing costs

The law permits nonjudicial panels, called labor reeducation panels, to sentence persons without trial to three years in reeducation-through-labor camps or other administrative detention programs. The labor reeducation committee is authorized to extend a sentence up to one year  Defendants could challenge reeducation-through-labor sentences under the administrative litigation law and appeal for a reduction in, or suspension of, their sentences. However, appeals rarely succeeded  Many other persons were detained in similar forms of administrative detention, known as "custody and education" (for prostitutes and those soliciting prostitutes) and "custody and training" (for minors who committed crimes). Administrative detention was used to intimidate political activists and prevent public demonstrations. Special reeducation centers were used to detain Falun Gong practitioners who had completed terms in reeducation-through-labor but whom authorities decided to continue detaining.

Authorities arrested persons on charges of revealing state secrets, subversion, and common crimes to suppress political dissent and social advocacy. Citizens were also detained and prosecuted under broad and ambiguous state secrets laws for, among other actions, disclosing information on criminal trials, meetings, and government activity. Information could retroactively be classified a state secret by the government

During the year human rights activists and defenders, Falun Gong practitioners, domestic and foreign journalists, unregistered religious figures, and former political prisoners and their family members were among those targeted for arbitrary detention or arrest

The government continued to use house arrest as a nonjudicial punishment and control measure against dissidents, former political prisoners, family members of political prisoners, petitioners, underground religious figures, and others it deemed politically sensitive  House arrest encompassed varying degrees of stringency but sometimes included complete isolation in one's own home or another location under lock and guard  In some cases house arrest involved constant monitoring, but the target of house arrest was occasionally permitted to leave the home to work or run errands  When outside the home, the subject of house arrest was usually, but not always, under surveillance  In some instances security officials assumed invasive positions within the family home, rather than monitoring from the outside

In March rights activist Hu Jia was released after spending 214 days under house arrest  On May 18, Hu and his wife, activist Zeng Jinyan, were placed under house arrest immediately before leaving on a trip overseas to speak about human rights  In November Hu Jia participated by webcam in a European Parliament hearing on human rights conditions in China  Hu was detained on December 27 on suspicion of inciting subversion of state authority  That same day, police reportedly placed Zeng

Jinyan under house arrest with the couple's newborn child Bao Tong, the former aide to Zhao Ziyang (who died in 2005 after spending more than 15 years under house arrest), remained under similar surveillance in his home; restrictions on Bao eased somewhat as he was allowed to give media interviews and to travel to his hometown during the year. In February local authorities blocked Dr Gao Yaojie, a prominent HIV/AIDS activist, from traveling overseas to receive a human rights award by placing her under house arrest. Following international pressure, Gao was permitted to travel. In August Yuan Weijing was prevented from leaving the country to receive an award on behalf of her husband, legal activist Chen Guangcheng. Despite being released from prison in June 2006, activist lawyer Zheng Enchong was placed under house arrest for over a year and continued to be under round-the-clock surveillance. Several underground Catholic priests and bishops were under house arrest for varying periods during the year. The longest serving among them may be Bishop Su Zhimin, who has reportedly been detained in a form of house arrest in Baoding, Hebei Province, since 1997 An unverified press report circulated in June 2006 stated that Bishop Su had died in custody The government has not responded to inquiries about Bishop Su

Police continued the practice of placing under surveillance, harassing, and detaining citizens around politically sensitive events, including before the second anniversary of Zhao Ziyang's death in January, the plenary sessions of the National People's Congress (NPC) and Chinese People's Political Consultative Conference (CPPCC) in March, and the 17th Communist Party Congress in October. Authorities in the XUAR used house arrest and other forms of arbitrary detention against those accused of the "three evils" of extremism, "splittism," and terrorism. Because authorities failed to distinguish carefully among peaceful political activities, "illegal" religious activities, and violent terrorism, it was difficult to determine whether raids, detentions, arrests, or judicial punishments were targeted at those peacefully seeking political goals, those seeking worship, or those engaged in violence. Others held under house arrest for varying periods during the year included Tiananmen activist Qi Zhiyong, rights lawyer Gao Zhisheng, and democracy activist Liu Anjun.

e. Denial of Fair Public Trial

The law states that the courts shall exercise judicial power independently, without interference from administrative organs, social organizations, and individuals. However, in practice the judiciary was not independent. It received policy guidance from both the government and the CCP, whose leaders used a variety of means to direct courts on verdicts and sentences, particularly in politically sensitive cases At both the central and local levels, the government and CCP frequently interfered in the judicial system and dictated court decisions. Trial judges decide individual cases under the direction of the adjudication committee in each court. In addition the CCP's law and politics committee, which includes representatives of the police, security services, procuratorate, and courts, had the authority to review and influence court operations at all levels of the judiciary; in some cases the committee altered decisions. People's congresses also had authority to alter court decisions, but this happened rarely

Corruption often influenced judicial decision making, and safeguards against corruption were vague and poorly enforced. In 2006 292 judges were investigated for "illegally handling cases," which most often means taking bribes or abusing power, 109 were found criminally liable Local governments appointed judges at the corresponding level of the judicial structure. Judges received their court finances and salaries from these government bodies and could be replaced by them Local authorities often exerted undue influence over the judges they appointed and financed. Several high-profile corruption cases involved procuracy officials In August the Anhui provincial deputy procurator-general was removed from his position after taking a government trip overseas based on a fraudulent invitation letter.

Courts lacked the independence and authority to rule on the constitutionality of laws. The law permits organizations or individuals to question laws and regulations they believe contradict the constitution, but a constitutional challenge first requires consultation with the body drafting the questioned regulation and can only be appealed to the NPC Accordingly, lawyers had little or no opportunity to use the constitution in litigation

The SPC is followed in descending order by the higher, intermediate, and basic people's courts. These courts handle criminal, civil, and administrative cases, including appeals of decisions by police and security officials to use reeducation-through-labor and other forms of administrative detention There were special courts for handling military, maritime, and railway transport cases

The CCP used a form of discipline known as shuang gui for violations of party discipline, but there were reports of its use against nonparty members. Shuang gui is similar to house arrest and can be authorized without judicial involvement or oversight Shuang gui requires the CCP party member under investigation to submit to questioning at a designated place and time. According to regulations of the Central Discipline Inspection Commission (CDIC) governing shuang gui, corporal punishment is banned, the member's dignity must be respected, and he or she is regarded as a comrade unless violations are proved Absent any legal oversight, it is unclear how these regulations were enforced in practice. In September 2006 Zeng Jinchun, secretary of the discipline inspection committee in Chenzhou City, Hunan Province, was removed for abusing his shuang gui authority by accepting bribes

Trial Procedures

Trials took place before a judge, who often was accompanied by "people's assessors," lay persons hired by the court to assist in decision making. According to statistics published during the year, there were 55,681 people's assessors. According to law, people's assessors had authority similar to judges, but in practice they deferred to judges and did not exercise an independent jury-like function.

The law gives most suspects the right to seek legal counsel shortly after their initial detention and interrogation, although police frequently interfered with this right. Individuals who faced administrative detention do not have the right to seek legal counsel

The government expanded the scope of legal aid and required authorities to notify criminal defendants of their right to apply for legal aid. Both criminal and administrative cases remained eligible for legal aid, although 70 percent or more of criminal defendants still went to trial without a lawyer. According to the Ministry of Justice, during the first half of the year legal aid was granted in 124,800 cases The number of government lawyers providing legal aid remained inadequate to meet demand Nonattorney legal advisors and government employees provided the only legal aid options in many areas According to government statistics, more than 12,155 employees provided legal aid at 3,171 legal aid centers. During 2006 courts waived more than $169.4 million (RMB 1.21 billion) in litigation costs.

Government-employed lawyers often refused to represent defendants in politically sensitive cases, and defendants frequently found it difficult to find an attorney When defendants were able to retain counsel in politically sensitive cases, government officials sometimes prevented effective representation of counsel. Officials deployed a wide range of tactics to obstruct the work of lawyers representing sensitive clients, including unlawful detentions, disbarment, intimidation, refusal to allow a case to be tried before a court, and physical abuse. According to the law, defense attorneys can be held responsible if their client commits perjury, and prosecutors and judges have wide discretion to decide what constitutes perjury. In February 2006 lawyer Tang Jingling was beaten by thugs after reaching out to the community to discuss Guo Feixiong. Police refused to investigate the incident In April 2006 Tang, who had begun practicing law at a second firm, was stripped of his license to practice law and dismissed from that law firm. In some sensitive cases, lawyers had no pretrial access to their clients, and defendants and lawyers were not allowed to speak during trials In practice criminal defendants often were not assigned an attorney until a case was brought to court For example, officials detained prominent rights attorney Gao Zhisheng in August 2006 on "suspicion of involvement in criminal activity" and subsequently deprived Gao of his right to counsel by obstructing efforts to formalize Gao's representation. Officials later claimed that Gao declined representation by counsel. Even in nonsensitive criminal trials, only one in seven defendants reportedly had legal representation.

The mechanism that allows defendants to confront their accusers was inadequate; the percentage of witnesses who came to court in criminal cases was less than 10 percent and as low as 1 percent in some courts. According to one expert, only 1 to 5 percent of trials involved witnesses. In most criminal trials, prosecutors read witness statements, which neither the defendant nor his lawyer had an opportunity to question Approximately 95 percent of witnesses in criminal cases did not appear in court to testify, in part due to hardship or fear of reprisals. Although the criminal procedure law says pretrial witness statements cannot serve as the sole basis for conviction, officials relied heavily on such statements to support their cases. Defense attorneys had no authority to compel witnesses to testify or to mandate discovery, although they could apply for access to government-held evidence relevant to their case In practice pretrial access to information was minimal, and the defense often lacked adequate opportunity to prepare for trial

The criminal justice system was biased toward a presumption of guilt, especially in high-profile or politically sensitive cases. The conviction rate for first-instance criminal

cases was above 99 percent in 2006. In many politically sensitive trials, which rarely lasted more than several hours, the courts handed down guilty verdicts immediately following proceedings. Courts often punished defendants who refused to acknowledge guilt with harsher sentences than those who confessed. There was an appeals process, but appeals rarely resulted in reversed verdicts. Appeals processes failed to provide sufficient avenue for review, and there were inadequate remedies for violations of defendants' rights. Nationwide, courts at all levels found 1,713 defendants not guilty, which represented 0.19 percent of criminal defendants at trial.

SPC regulations require all trials to be open to the public, with certain exceptions, such as cases involving state secrets, privacy, and minors. Authorities used the legal exception for cases involving state secrets to keep politically sensitive proceedings closed to the public and sometimes even to family members, and to improperly withhold access to defense counsel. Under the regulations, foreigners with valid identification are allowed the same access to trials as citizens, but in practice foreigners were permitted to attend court proceedings by invitation only. As in past years, foreign diplomats and journalists sought permission to attend a number of trials only to have court officials reclassify them as "state secret" cases, fill all available seats with security officials, or otherwise close them to the public. Between June and July in Guangzhou, representatives of a foreign consulate initially were granted permission to attend the trial of Guo Feixiong, but authorities postponed the trial date and subsequently denied access to the consulate. On November 14, Guo was sentenced to five years' imprisonment and fined over $5,600 (RMB 40,000) following a year in detention. Some trials were broadcast, and court proceedings were a regular television feature. A few courts published their verdicts on the Internet.

There was no adversary system, no presumption of innocence, and judges and prosecutors typically used an inquisitorial style to question the defendant, who was often the only witness. The law affords no right to remain silent, no protection against double jeopardy, and no rules governing the type of evidence that may be introduced.

Police and prosecutorial officials often ignored the due process provisions of the law. Because of the lack of due process, the consequences were particularly egregious in death penalty cases. By law there are at least 68 capital offenses, including nonviolent financial crimes such as counterfeiting currency, embezzlement, and corruption. Following the SPC's reassumption of death penalty review power from provincial courts on January 1, executions were not to be carried out on the date of conviction, but only on the SPC's approval following review. Media reports stated that approximately 10 percent of executions were for economic crimes, especially corruption. However, SPC Vice President Jiang Xingchang stated the SPC handed down only "a very small number of death sentences for economic crimes now, just a few a year."

Through the monitoring of publicly available records and reports, Amnesty International estimated that in 2006 at least 1,770 persons were executed, although the true figure was believed to be much higher. Other sources estimated that between 7,500 and 8,000 persons were executed in 2006. On January 1, the SPC reassumed jurisdiction to conduct final review of death penalty cases handed down for immediate execution (but not death sentences handed down with a two-year reprieve), thus consolidating and reclaiming the death penalty review power from provincial courts. An SPC regulation effective February 28 clarified circumstances in which the SPC should approve, revise, or remand death sentences; in most cases the SPC does not have the authority to issue a new decision or declare a defendant innocent if it discovers errors in the original judgment. The regulation also provided that the SPC would generally limit the exercise of its discretion to approve or disapprove lower court decisions. Courts handling death penalty cases in the second instance are required to conduct hearings at which witnesses in certain circumstances, such as when the prosecution and defense disagree about a witness' testimony or when the judge orders it, should testify. In August the SPP sent to local procuracies guidance to improve due process standards in death penalty cases. Monitoring and analysis of the application of the death penalty was difficult because official statistics remained a state secret. After the new procedures went into effect, three Beijing intermediate courts asserted the number of death penalty cases declined by 10 percent, although they did not provide underlying figures. Given the absence of open procedures and statistics, it was not possible to evaluate independently the implementation and effects of the new procedures.

Political Prisoners and Detainees

Government officials continued to deny holding any political prisoners, asserting that authorities detained persons not for their political or religious views, but because they violated the law; however, the authorities continued to confine citizens for reasons related to politics and religion. Tens of thousands of political prisoners remained incarcerated, some in prisons and others in reeducation-through-labor camps or administrative detention. The government did not grant international humanitarian organizations access to political prisoners.

Foreign NGOs estimated that several hundred persons remained in prison for the repealed crime of "counterrevolution," and thousands of others were serving sentences under the state security law, which authorities stated covers crimes similar to counterrevolution. Persons who continued to be detained for counterrevolutionary offenses included labor activist Hu Shigen and inner Mongolian activist Hada. Foreign governments urged the government to review the cases of those charged before 1997 with counterrevolution and to release those who had been jailed for nonviolent offenses under provisions of the criminal law, which were eliminated when the law was revised. To date, no systematic review has occurred. The government maintained that counterrevolutionary prisoners were eligible for parole and early release on an equal basis with other prisoners but provided no evidence to support this assertion. According to Amnesty International, dozens of people were believed to remain in prison in connection with their involvement in the 1989 Tiananmen prodemocracy movement. Others estimated that at least 10 and as many as 200 Tiananmen activists were still in prison. The exact number was unknown because official statistics have never been made public.

Many political prisoners remained in prison or under other forms of detention at year's end, including rights activist Hu Jia, journalist Shi Tao, Internet writers Yang Zili and Xu Wei; labor activists Yao Fuxin, Mu Mingjun, Hu Shigen, Huang Xiangwei, Kong Youping, Ning Xianhua, Li Jianfeng, Li Xintao, Lin Shun'an, Yue Tianxiang, Zhang Shanguang, Gao Hongming, Zha Jianguo, Li Wangyang, and She Wanbao; China Democracy Party cofounder Qin Yongmin; family planning whistleblower Chen Guangcheng; Su Zhimin; Christian activist Zhang Rongliang, Uighurs Tohti Tunyaz and Dilkex Tilivaldi; and Tibetans Jigme Gyatso, Tenzin Deleg, and Gendun Choekyi Nyima. Political prisoners obtained parole and sentence reduction much less frequently than ordinary prisoners.

Criminal punishments included "deprivation of political rights" for a fixed period after release from prison, during which the individual is denied the already-limited rights of free speech and association granted to other citizens. Former prisoners sometimes found their status in society, ability to find employment, freedom to travel, and access to residence permits and social services severely restricted. Former political prisoners and their families frequently were subjected to police surveillance, telephone wiretaps, searches, and other forms of harassment, and some encountered difficulty in obtaining or keeping employment and housing.

Civil Judicial Procedures and Remedies

Courts deciding civil matters suffered from internal and external limitations on judicial independence. The State Compensation Law provides administrative and judicial remedies for deprivations of criminal rights, such as wrongful arrest or conviction, extortion of confession by torture, or unlawful use of force resulting in bodily injury. In civil matters, prevailing parties often found it difficult to enforce court orders, and resistance to the enforcement sometimes extended to forcible resistance to court police.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law states that the "freedom and privacy of correspondence of citizens are protected by law;" however, the authorities often did not respect the privacy of citizens in practice. Although the law requires warrants before law enforcement officials can search premises, this provision frequently was ignored; moreover, the PSB and prosecutors can issue search warrants on their own authority without judicial consent, review, or consideration. Cases of forced entry by police officers continued to be reported.

During the year authorities monitored telephone conversations, facsimile transmissions, e-mail, text messaging, and Internet communications. Authorities also opened and censored domestic and international mail. The security services routinely monitored and entered residences and offices to gain access to computers, telephones, and fax machines. All major hotels had a sizable internal security presence, and hotel guestrooms were sometimes bugged and searched for sensitive or proprietary materials.

Some citizens were under heavy surveillance and routinely had their telephone calls monitored or telephone service disrupted. The authorities frequently warned dissidents and activists, underground religious figures, former political prisoners, and others whom the government considered to be troublemakers not to meet with foreign journalists or diplomats, especially before sensitive anniversaries, at the time of important government or party meetings, and during the visits of high-level foreign officials. Security personnel also harassed and detained the family members of political prisoners, including following them to meetings with foreign reporters and

diplomats and urging them to remain silent about the cases of their relatives.

Forced relocation because of urban development continued and in some locations, increased during the year. During the year protests over relocation terms or compensation, some of which included thousands of participants, took place and some protest leaders were prosecuted. Some activists and NGOs linked evictions in Beijing to construction for the 2008 Olympics. In rural areas, relocation for major state projects, such as dams, and for commercial development resulted in the forced relocation of millions of persons.

The government restricted the rights of parents to choose the number of children they will have and the period of time between births. While the national family planning authorities made some progress on maternal health issues and in emphasizing quality of care in family planning practices, the country's birth limitation policies retain harshly coercive elements in law and practice. The penalties for violating the law are strict, leaving some women little choice but to abort pregnancies

The law standardizes the implementation of the government's birth limitation policies, however, enforcement varied significantly from place to place. The law grants married couples the right to have one birth and allows eligible couples to apply for permission to have a second child if they meet conditions stipulated in local and provincial regulations. The law requires couples that have an unapproved child to pay a "social compensation fee," which sometimes reached 10 times a person's annual disposable income, and grants preferential treatment to couples who abide by the birth limits. Although the law states that officials should not violate citizens' rights, these rights, as well as penalties for violating them, are not clearly defined. The law provides significant and detailed sanctions for officials who help persons evade the birth limitations.

Social compensation fees are set and assessed at the local level. The law requires family planning officials to obtain court approval before taking "forcible" action, such as detaining family members or confiscating and destroying property of families who refuse to pay social compensation fees. However, in practice this requirement was not always followed.

The one-child limit was more strictly applied in the cities, where only couples meeting certain conditions (e.g., both parents are only children) were permitted to have a second child. In most rural areas (including towns of under 200,000 persons), which included approximately 60 percent of the country's population, the policy was more relaxed, generally allowing couples to have a second child if the first was a girl or had a disability

All provinces have regulations implementing the national family planning law. For example, Anhui Province's law permits 13 categories of couples, including coal miners, some remarried divorcees, and some farm couples, to have a second child. Ethnic minorities, such as the Uighurs and the Tibetans, are also allowed more than one child. Several provinces--Anhui, Hebei, Heilongjiang, Hubei, Hunan, Jilin, Liaoning, and Ningxia--require "termination of pregnancy" if the pregnancy violates provincial family planning regulations. An additional 10 provinces--Fujian, Guizhou, Guangdong, Gansu, Jiangxi, Qinghai, Sichuan, Shanxi, Shaanxi, and Yunnan--require unspecified "remedial measures" to deal with out-of-plan pregnancies

In order to delay childbearing, the law sets the minimum marriage age for women at 20 years and for men at 22 years. It continued to be illegal in almost all provinces for a single woman to have a child. Social compensation fees were levied on unwed mothers.

The country's population control policy relied on education, propaganda, and economic incentives, as well as on more coercive measures such as the threat of job loss or demotion and social compensation fees. Psychological and economic pressures were common. Those who violated the child limit policy by having an unapproved child or helping another to do so faced disciplinary measures such as job loss or demotion, loss of promotion opportunity, expulsion from the party (membership in which was an unofficial requirement for certain jobs), and other administrative punishments, including in some cases the destruction of property. In the case of families that already had two children, one parent was often pressured to undergo sterilization. The penalties sometimes left women with little practical choice but to undergo abortion or sterilization.

The law states that family planning bureaus will conduct pregnancy tests on married women and provide them with unspecified "follow-up" services. Some provinces fine women who do not undergo periodic pregnancy tests. For example, in Hebei fines range from $28 to $70 (RMB 200 to 500) and in Henan from $7 to $70 (RMB 50 to 500)

Officials at all levels remained subject to rewards or penalties based on meeting the population goals set by their administrative region. Promotions for local officials depended in part on meeting population targets. There continued to be sporadic reports of violations of citizens' rights by local officials attempting to reduce the number of births in their region. The most egregious reports of mass violations occurred in April and May in Guangxi Province, where authorities forced dozens of pregnant women to undergo abortions at a hospital in Baise City, some as late as nine months. In a separate incident in Guangxi, thousands of residents of nine towns in Bobai and Rong counties protested illegal family planning measures, which included forced abortions and sterilizations, by attacking government workers and looting family planning offices. The protesters claimed that thousands of homes had been ransacked by local officials, who also levied excessive fines to punish households with unauthorized pregnancies. Media reports stated that villagers were fined up to $9,800 (RMB 70,000), whereas villagers reported that fines normally do not exceed $700 (RMB 5,000). National authorities issued a statement instructing the local government to resolve the matter lawfully, protect citizens' legitimate rights, and train staff according to the law, including quality of service. National authorities stated that they would investigate reports of coercion and sanction violators, although by year's end no Guangxi officials had been punished.

According to law, citizens may sue officials who exceed their authority in implementing birth-planning policy. A couple from Hebei Province sued local family planning officials for forcing a late-term abortion in September 2000 of a fetus deemed "illegal" because it was conceived five months prior to the couple's marriage, which they said destroyed the mother's ability to conceive. In May the district court ruled against them, but in an unprecedented move, a higher court accepted the appeal in July. At year's end the case was still pending. However, there existed few protections for whistleblowers against retaliation from local officials

Laws and regulations forbid the termination of pregnancies based on the sex of the fetus, but because of the intersection of birth limitations with the traditional preference for male children, particularly in rural areas, many families used ultrasound technology to identify female fetuses and terminate these pregnancies. National Population and Family Planning Commission (NPFPC) regulations ban nonmedically necessary determinations of the sex of the fetus and sex-selective abortions, but some Chinese experts believed that the penalties for violating the regulations were not severe enough to deter unlawful behavior. According to government estimates during the year, the male-female birth ratio for first births in rural areas was 122.85 to 100, higher than the national average of 119.58 to 100 (compared with norms elsewhere of between 103 and 107 to 100), and in some parts of the country, the ratio was even more skewed. For second births, the national ratio was 152 to 100. While the NPFPC continued to deny a direct connection between family planning and skewed sex ratios at birth, it promoted expanded programs to raise awareness of the sex ratio imbalance and to improve protection of the rights of girls.

Family members of activists and rights defenders, Falun Gong practitioners, journalists, unregistered religious figures, and former political prisoners were targeted for arbitrary arrest and detention. On September 29, state security officers detained the brother and son of Ye Guozhu, who was imprisoned in 2004 for leading protests against forced evictions. Ye Guozhu's son, Ye Mingjun, reportedly was released on bail on October 30. Ye Guozhu's brother, Ye Guoqiang, remains in custody. Ye Guoqiang reportedly has not been permitted to meet with attorneys, and it is not clear if he has been formally charged. In November 2006 Geng He, the wife of prominent human rights defender Gao Zhisheng, was attacked by local officials while shopping in Beijing. On May 27, Yuan Weijing, the wife of legal advisor Chen Guangcheng, was released from house arrest. She reportedly has continued to be subjected to police surveillance and other harassment.

Section 2 Respect for Civil Liberties, Including.

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press, although the government generally did not respect these rights in practice. The government interpreted the CCP's "leading role," as mandated in the constitution, as superseding and circumscribing these rights. The government continued to control print, broadcast, and

electronic media tightly and used them to propagate government views and CCP ideology. Some controls tightened during the year, and it was increasingly difficult to express views that differed from the official line through broadcast media and in print. All media were expected to abide by censorship guidelines issued by the party. Media outlets received regular guidance from the Central Propaganda Department, which listed topics that should not be covered, including politically sensitive topics. During the year propaganda officials issued new guidelines restricting media coverage of an additional 20 topics, including judicial corruption and campaigns by legal rights defenders. These measures greatly restricted the freedom of journalists and Internet writers to report the news and led to a high degree of self-censorship.

So long as the speaker did not publish views that challenged the CCP or disseminate such views to overseas audiences, the range of permissible topics for private speech continued to expand. Political topics could be discussed privately and in small groups without punishment, and minor criticisms of the government were common topics of daily speech. However, public speeches, academic discussions, and speeches at meetings or in public forums covered by the media remained circumscribed. The government also frequently monitored gatherings of intellectuals, scholars, and dissidents where political or sensitive issues were discussed. Those who aired views that disagreed with the government's position on controversial topics or disseminated such views to an overseas audience risked punishment ranging from disciplinary action at government work units to police interrogation and detention.

On January 1, the government implemented new temporary regulations governing foreign media coverage related to the 2008 Olympic Games. The regulations, which are set to expire October 17, 2008, eliminate the requirement that foreign journalists must obtain permission from local authorities before conducting interviews and investigations outside Beijing and Shanghai. The FCCC reported that although the regulations improved overall reporting conditions for foreign journalists, the government and state security officials continued to detain, harass, and intimidate foreign journalists, they were also still required to apply for the rarely granted official permits to visit the Tibet Autonomous Region (TAR) and XUAR. In March security forces detained and expelled two BBC journalists from Zhushan, Hunan Province, who were investigating reports of the death of a student during a protest. During an August trip to the XUAR, a journalist for *Le Monde* newspaper was interrogated and searched by local authorities. According to the journalist, his sources in the XUAR were also questioned and intimidated after meeting with him.

Detention and harassment of journalists and Chinese employees working for foreign media outlets raised concern that local officials were attempting to intimidate foreign correspondents and newspapers. However, some foreign journalists reported that the temporary regulations widened access to individuals and topics that previously would have been strictly prohibited. Reuters interviewed prominent dissident Bao Tong on more than one occasion, as well as Xinna, the wife of Inner Mongolian political prisoner Hada. In July an FCCC survey found that 40 percent of foreign correspondents said they had encountered government interference, including intimidation of sources, detention, surveillance, and violence. Fifteen correspondents operating under the new rules reported that they had been detained. Some journalists said they encountered difficulties with officials who refused to accept the regulations. Some foreign academics and journalists critical of the country continued to be denied visas.

The Central Propaganda Department continued to list subjects that were off limits to the domestic media, and the government maintained authority to approve all programming. Nearly all print media, broadcast media, and book publishers were owned by, or affiliated with, the CCP or a government agency. There were a small number of privately owned print publications, but no privately owned television or radio stations. International media were not allowed to operate freely and faced heavy restrictions.

Journalists who reported on topics that met with the government's or local authorities' disapproval continued to suffer harassment, detention, and imprisonment. In July local authorities from Henan Province initially blocked a story that uncovered more than 1,000 illegal slave laborers in the brick kilns in Henan and Shanxi provinces, most of whom were kidnapped children or persons with mental disabilities. A state council information official criticized the local authorities' actions, and the story was covered extensively. However, within two weeks the propaganda department reportedly issued an order to stop the discussion. The local journalist, Fu Zhenzhong, was not permitted to speak with foreign correspondents, and families questioned by the foreign media were visited by the police, who reportedly urged them to avoid contact with outsiders. Although the factory owner, his foremen, and several other low-level bosses were prosecuted, only four officials, including one police officer, were prosecuted. Ninety-five party members who were implicated in the effort to cover up received warnings (see sections 5 and 6 c.)

Local governments continued to use anonymous thugs suspected of being plainclothes police personnel to intimidate journalists. In January thugs beat to death LAN Chengzhang, a reporter for the *China Trade Times*, who was researching illegal coal mines in Hunyuan, Shanxi Province. The thugs allegedly were hired by the owner of the coal mine, but local police reportedly obstructed the activities of journalists who went to Hunyuan to investigate Lan's death. In August unidentified assailants reportedly beat five local journalists, including one from the *People's Daily*, who were reporting on a bridge collapse in Fenghuang, Hunan Province. Local officials detained the reporters and accused them of "illegal reporting," while the assailants were reportedly released without charge.

Journalists who remained in prison included Ching Cheong, Lu Gengsong, Lu Jianhua, Huang Jinqiu, Li Changqing, Yu Huafeng, Li Minying, Cheng Yizhong, and Shi Tao. International NGOs reported that at least 29 journalists and 51 cyber dissidents remained imprisoned.

Government officials used criminal prosecution, civil lawsuits, and other punishments to intimidate authors and block controversial writings. On April 13, writer and painter Yan Zhengxue was sentenced to three years in prison for inciting subversion in connection with articles he posted on foreign Web sites attacking CCP leaders. Yan was detained in October 2006 and formally changed with inciting subversion in November 2006.

During the year journalists and editors who exposed corruption scandals frequently faced problems with the authorities. Newspapers and journalists who reported on corruption without government or party approval faced possible sanction, although authorities allowed reporting on some high-profile cases. Propaganda officials restricted independent reporting of the case of former Shanghai Party Secretary Chen Liangyu, who was dismissed from the CCP in July for corruption, and ordered publications to rely only on Xinhua News Agency reports for their coverage of this topic. Similar restrictions applied in the case of Zheng Xiaoyu, the former director of the State Food and Drug Administration, who was executed on July 10. Qi Chonghua, a *Shandong Fazhi Zaobao* journalist, was reportedly detained on June 25 and held for two months after reporting allegations of government corruption in Tengzhou, Shandong.

The government continued to target publications that contained political information and restricted reporting on politically sensitive topics. During the first three months of the year, authorities confiscated nearly 400,000 copies of publications deemed to have harmed social stability, endangered state security, or incited ethnic separatism. In July Beijing PSB officials shut down the *China Development Brief*, an online journal that served as an information clearing house for NGOs and reported on social and civil society developments. In June security officials investigated the *Chengdu Evening News* after it ran an advertisement saluting the mothers of victims of the June 4 Tiananmen crackdown. The investigation determined that a young employee unfamiliar with June 4 history mistakenly allowed the advertisement to run.

Authorities continued to block reporting and restricted journalists from covering protests, including the June 1 and 2 demonstrations in Xiamen, during which an estimated 10,000 residents marched against the proposed construction of a chemical plant. Following the protest city authorities banned anonymous online postings. Police also detained protest organizer Li Yiqiang the day after the march and charged him with illegal assembly.

Officials continued to censor, ban, and sanction reporting on labor, health, environmental crises, and industrial accidents. On August 15, authorities in Hangzhou, Zhejiang Province, reportedly ordered an environmental protection Web site to remove posted articles about environmental activist Wu Lihong. Chinese media stated that Wu had been sentenced the week before to three years' imprisonment on charges of fraud and extortion, though foreign media reported that the sentence was retribution for his work exposing the pollution of Tai Lake. In August authorities interfered with reporting a mine disaster in Xintai, Shandong Province, by preventing journalists from interviewing the victims' relatives and urging the media to emphasize efforts to rescue trapped miners.

Several reports of food safety incidents surfaced, including a July story in which a Beijing television station reported that a street vendor substituted chemically treated cardboard for pork in its products. The government later announced that the story was false and sanctioned the reporter to one year in jail. In August the General Administration of Press and Publications (GAAP) launched a campaign to stamp out illegal news coverage and "false news." In November an emergency response law went into effect that punishes media organs for mistakes made in reporting natural disasters and emergencies, as well as government efforts to handle them, if they fail to obtain prior authorization to report. Journalists expressed concern that the measures were intended to further restrict press freedom. On November 12, the government-run English language newspaper *China Daily* reported that the government would, in preparation for the 2008 Olympics, compile a database of foreign journalists, ostensibly to combat the phenomenon of "fake journalists" posing as reporters to extort money. The Ministry of Foreign Affairs later denied that such a database existed.

By law, only government-approved publishing houses were permitted to print books. The State Press and Publications Administration (PPA) controlled all licenses to publish. No newspaper, periodical, book, audio, video, or electronic publication may be printed or distributed without the PPA and relevant provincial publishing authorities' approval of both the printer and distributor. Individuals who attempted to publish without government approval faced imprisonment, fines, confiscation of their books, and other sanctions. The charge that Guo Feixiong conducted "illegal business activity" reportedly resulted from his publication of a book, *Shenyang's Political Earthquake*, without government approval. The CCP exerted control over the publishing industry by preemptively classifying certain topics as off limits. Underground printing houses were targets of periodic campaigns to stop all illegal publications, including pornography and pirated computer software and audiovisual products. Many intellectuals and scholars exercised self-censorship, anticipating that books or papers on political topics would be deemed too sensitive to be published. The censorship process for private and government media also increasingly relied on self-censorship and, in a few cases, post-publication sanctions.

During the year authorities in Urumqi, XUAR, destroyed over 25,000 "illegal" religious books. In 2006 XUAR authorities reported confiscating publications about Islam with "unhealthy content." Uighur writers and editors, including the editor of the *Kashgar Literature Journal*, Korash Huseyin, reportedly were jailed in 2005 for publishing stories that authorities maintained advocated separatism. Authorities continued to ban books containing content they deemed controversial. In January the GAPP reportedly banned eight books. Most of the banned titles dealt with China's recent history, including Zhang Yihe's *Past Stories of Peking Opera Actors*.

The authorities continued to jam, with varying degrees of success, Chinese-, Uighur-, and Tibetan-language broadcasts of the Voice of America (VOA), Radio Free Asia (RFA), and the BBC. English-language broadcasts on VOA generally were not jammed. Government jamming of RFA and BBC appeared to be more frequent and effective. Internet distribution of "streaming radio" news and "podcasts" from these sources often was blocked. Despite jamming overseas broadcasts, VOA, BBC, RFA, Deutsche Welle, and Radio France International had a large audience, including rights advocates, ordinary citizens, and government officials.

Television broadcasts of foreign news, largely restricted to hotels and foreign residence compounds, were occasionally subject to censorship. Politically sensitive coverage in Chinese, and to a lesser extent in English, was censored more than coverage in other languages. "Public service announcements" frequently interrupted news items critical of the government, particularly in the south, where television programming from Hong Kong was available. In July China reportedly initiated a crackdown against local cable television systems that were illegally receiving the Hong Kong-based news station Phoenix TV via satellite. Prior to the crackdown, an estimated 200 million citizens had access to the television station. The government prohibited some foreign and domestic films from appearing in the country when they were deemed to touch upon sensitive themes.

Internet Freedom

The China Internet Network Information Center reported that at the end of the year the number of Internet users increased to 210 million, 78 percent of whom had broadband access to the Internet. There were 53 million Internet users in rural areas, more than double the number in 2006. While the government took steps to monitor Internet use, control content, restrict information, and punish those who violated regulations, these measures were not universally effective. A large number of Internet users used proxy servers to access banned content. During the year political dissidents successfully used Internet instant messaging technology to hold large-scale, virtual meetings. In January President Hu Jintao called for purifying the Internet environment and stated that the CCP's ability to control the Internet is a matter affecting state stability. In the lead-up to the 17th Communist Party Congress in October, Internet regulators reportedly ordered the country's leading search engine operators, including Google, Baidu, Yahoo, Sina, and Sogou, to delete all "harmful information." Restrictions aimed at increasing government control over the Internet included stricter Web site registration requirements, enhanced official control of online content, and an expanded definition of illegal online content. All Web sites are required to be licensed by, or registered with, the Ministry of Information Industry (MII).

The MPS, which monitors the Internet under guidance from the Central Propaganda Department, employs thousands of people at the national, provincial, and local levels to police electronic communications. According to news reports, by the end of June all major portals and online forums were monitored by MPS, reportedly as part of a campaign against online pornography. Beijing public security officials unveiled cartoon police officers that popped up on Internet users' screens to warn them to stay away from forbidden Web sites. Operators of Web portals, blog hosting services, and other content providers engaged in significant self-censorship to ensure their servers were free from politically sensitive content.

The government consistently blocked access to sites it deemed controversial, such as sites discussing Taiwan and Tibetan independence, underground religious and spiritual organizations, democracy activists, and the 1989 Tiananmen massacre. The government also at times blocked access to selected sites operated by major foreign news outlets, health organizations, foreign governments, and educational institutions. According to news reports, between April and September, the MPS shut down 18,400 illegal Web sites; 8,808 for carrying pornographic content and another 9,593 because they were unregistered.

The number of blocked and censored sites increased around major political events and sensitive dates, particularly during the period leading up to the October 17th Communist Party Congress. The authorities employed more sophisticated technology enabling selective blocking of specific content rather than entire Web sites. Such technology also was used to block e-mails containing sensitive content. Individuals using the Internet in public libraries were required to register using their national identity card. Internet usage reportedly was monitored at all terminals in public libraries.

On February 13, lawyer Pu Zhiqiang, one of four lawyers who initiated an online campaign protesting the censorship of the Xinlang (new wave) blog, had his own blog shut down. In July authorities reportedly blocked access to an overseas Web site shvoong.com, which provided abstracts of academic papers and literature popular with intellectuals and students. In July Shanghai officials reportedly shut down an online literary forum run by poet Lu Yang reportedly due to a posting related to the anniversary of Tiananmen. According to news reports, authorities disconnected entire Internet data centers, which contained thousands of servers, because of blog pages containing sensitive material.

Regulations prohibit a broad range of activities that authorities interpret as subversive or slanderous to the state. Internet service providers (ISPs) were instructed to use only domestic media news postings, to record information useful for tracking users and their viewing habits, to install software capable of copying e-mails, and to end immediately transmission of so-called subversive material. Many ISPs practiced extensive self-censorship to avoid violating broadly worded regulations.

During the year individuals were detained or imprisoned for their Internet writing. In August Internet blogger He Weihua was arrested by Hunan authorities and committed to a mental hospital, allegedly as punishment for antigovernment writings. On August 14, a court in Hangzhou sentenced Internet writer Chen Shuqing to four years in prison for inciting subversion after he criticized the government online. In March a court in Ningbo, Zhejiang Province, sentenced Internet writer Zhang Jianhong (also known as Li Hong) to six years in prison. Zhang was arrested in 2006 after writing an article calling for activist Gao Zhisheng's release. Zhang was a founder and editor of the literary and news Web site Aegean Sea (*Aiqinhai*), which authorities shut down in March 2006. On December 13, police in Guilin, Guangxi Province, arrested Internet writer Wang Dejia (also known as Jing Chu) after Wang posted several articles critical of the government. Other individuals who remained in prison for posting political or dissenting views on the Internet included journalist and Internet essayist Li Changqing, activist Ren Zhiyuan, Internet essayist Yang Tongyan (Yang Tianshui), and Internet author and human rights advocate Guo Qizhen.

On August 21, 14 major ISPs signed a "blog hosting self discipline pledge" sponsored by the Internet Society of China. Under the pledge, companies agreed to encourage bloggers to register under their real names and to erase any "illegal or unhealthy" postings. Companies that signed the pledge included popular Chinese Internet companies like Sina.com and Sohu.com as well as Yahoo China, which is operated by Alibaba.com, and MSN China. During the year the government also continued to pressure companies to sign a "Public Pledge on Self Discipline for China's Internet Industry." Those who signed the pledge agreed not to spread information that "breaks laws or spreads superstition or obscenity." They also promised to refrain from "producing, posting, or disseminating pernicious information that may jeopardize state security and disrupt social stability." According to court documents, in past years Yahoo provided information to security authorities, including access to private e-mail accounts, used in the prosecution of journalist Shi Tao and dissident Wang Xiaoning. The company said it was required to provide the information under national law and customs. Both men remained in prison at year's end.

Internet cafes must install software that allows government officials to monitor customers' Internet usage. Internet users at cafes were often subject to surveillance. Many cafes sporadically enforced regulations requiring patrons to provide identification.

Academic Freedom and Cultural Events

The government did not respect academic freedom and increased controls on political and social discourse at colleges, universities, and research institutes. Scholars and researchers reported varying degrees of control regarding issues they could examine and conclusions they could draw. Some law professors were warned not to propose abolition of the reeducation-through-labor system. Scholar Xu Zerong, who was convicted in 2001 of providing state secrets abroad and conducting illegal business activities in connection with his research on China's role in the Korean War, remained in prison at year's end. In March Renmin University removed Zhang Ming as dean of the Political Science Department after Zhang made critical statements on his blog about Renmin University and the state of academic freedom.

Authorities canceled university conferences involving foreign and domestic academics on short notice when they deemed the topics at issue to be too sensitive. On occasion information outreach, educational exchanges, and other cultural and public diplomacy programs organized by foreign governments were subject to government interference. Foreign experts invited to participate in foreign government sponsored programs on certain topics were denied visas. In February authorities barred more than 20 writers from participating in the International PEN writers' conference in Hong Kong. According to press accounts, some writers were denied travel documents, some were turned away at the border, and others were visited by authorities before leaving and warned not to attend. Organizers of the PEN conference, which promotes writers' freedoms, stated that actions taken by authorities tightened creative freedoms over the past year.

The government continued to use political attitudes and affiliations as criteria for selecting persons for the few government-sponsored study abroad programs but did not impose such restrictions on privately sponsored students. The government and the party control the appointment of high-level officials at universities. While party membership is not always a requirement to obtain a tenured faculty position, scholars without party affiliation often have fewer chances for promotion.

Researchers residing abroad also were subject to sanctions from the authorities when their work did not meet with official approval.

b  Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of peaceful assembly; however, the government severely restricted this right in practice. The law stipulates that such activities may not challenge "party leadership" or infringe upon the "interests of the state." Protests against the political system or national leaders were prohibited. Authorities denied permits and quickly suppressed demonstrations involving expression of dissenting political views.

Demonstrations with political or social themes were broken up quickly, sometimes with excessive force. Social inequalities and uneven economic development, combined with dissatisfaction over widespread official corruption, resulted in increased social unrest. As in past years, the vast majority of demonstrations during the year concerned land disputes, housing issues, industrial, environmental, and labor matters, government corruption, taxation, and other economic and social concerns. In January the MPS announced that the number of "mass incidents," a vague term encompassing all kinds of protests and disturbances, fell 16.5 percent in 2006. Officials estimated the number of mass incidents was 23,000, although experts questioned the reliability of this figure. In September, 2,000 demobilized military personnel in three provinces used cell phones and the Internet to coordinate protests over poor conditions at job retraining schools. In March as many as 20,000 persons in Yongzhou, Hunan Province, rioted when a local bus company raised fares. According to foreign media reports, a student died in the melee, and many more were injured. However, local authorities claimed there were no deaths or casualties, and there has been no official investigation into the incident. In May thousands of residents across two counties and nine towns in Guangxi Province rioted against illegal family planning measures, attacking government workers and looting family planning offices.

Authorities detained potential protesters before and after the June 4 anniversary of the Tiananmen massacre, the second anniversary of Zhao Ziyang's death in January, the March plenary sessions of the NPC and CPPCC, and the 17th Communist Party Congress in October. Dissidents were detained around the time of other sensitive events to prevent public demonstrations. Labor protests over restructuring of state-owned enterprises and resulting unemployment continued, as did protests over environmental degradation and major infrastructure projects, such as dams. All concerts, sports events, exercise classes, or other meetings of more than 200 persons required approval from public security authorities. In practice much smaller gatherings also ran the risk of being disrupted by authorities.

Persons petitioning the government continued to face restrictions on their rights to assemble and raise grievances. Official news media reported that citizens presented 12.7 million petitions to "letters and visits" offices in 2005, but only 0.2 percent of petitions filed received a response. Most petitions mentioned grievances about land, housing, entitlements, the environment, or corruption. Most petitioners sought to present their complaints at national and provincial "letters and visits" offices.

Efforts to rid Beijing of petitioners resulted in heightened harassment, detention, incarceration, and restrictions on their rights to assemble and raise grievances. Petitioners from several provinces reported being accosted by plainclothes police at train and bus stations entering Beijing and returned to their homes before registering their petitions in the capital. Police were dispatched to detain or disperse petitioners gathering at points in Beijing to lodge petitions. In December Beijing's municipal government reportedly demolished the last dwellings of a petitioner village in the Fengtai District that housed up to 4,000 petitioners. Authorities required residents to vacate their homes made way for demolition. The demolition was necessary to build a road, but critics asserted that the demolition at Fengtai, near bus and train stations and the central government's appeals office, sought to rid Beijing of petitioners before the 17th Communist Party Congress. Officials from Nanyang City, Henan Province, reportedly operated a "black" or illegal jail in Beijing to detain Nanyang petitioners arriving in the capital to press grievances for property claims, police brutality, and official corruption. An official at the "black jail" reportedly stated that the detention site operated with central government permission. Although regulations implemented in 2005 banned retaliation against petitioners, reports of retaliation continued. This was partly due to incentives provided to local officials by the central government to prevent petitioners in their regions from raising complaints to higher levels. Incentives included provincial cadre evaluations based in part on the number of petitions from their provinces. This initiative aimed to encourage local and provincial officials to resolve legitimate complaints but also resulted in local officials sending security personnel to Beijing and forcibly returning the petitioners to their home provinces. Such detentions occurred both before and after the enactment of the new regulations and often went unrecorded.

Freedom of Association

The law provides for freedom of association, but the government restricted this right in practice. CCP policy and government regulations require that all professional, social, and economic organizations officially register with, and be approved by, the government. In practice these regulations prevented the formation of truly autonomous political, human rights, religious, spiritual, labor, and other organizations that might challenge government authority.

The government maintained tight controls over civil society organizations and over the past three years increased measures aimed at supervising and controlling them. In 2005 authorities established a task force to increase scrutiny over NGOs, especially those with links overseas. Published reports stated the task force was aimed at blocking NGOs from fomenting political change. International foundations, NGOs involved in social and charitable activities, and groups dedicated to combating discrimination against women, persons with disabilities, and minorities were reportedly targets of the campaign, along with organizations that focused on human rights and labor issues.

To register, an NGO must find a government agency to serve as the NGO's organizational sponsor, have a registered office, and hold a minimum amount of funds. Organizations with social or educational purposes that previously had been registered as private or for-profit businesses reportedly were requested to find a government sponsor and reregister as NGOs during the year. Although the registered organizations all came under some degree of government control, some NGOs were still able to operate with some degree of independence.

Despite tight restrictions and regulations, the number of civil society organizations continued to grow. According to official statistics, by the end of 2006, there were 354,000 registered civil society organizations. The World Bank estimated that there were between 300,000 and 700,000 NGOs, a significant increase from 4,800 in 1988. Other experts estimated that, including both registered and unregistered groups, there were perhaps as many as eight million quasi-governmental organizations and NGOs. Civil society organizations existed under a variety of formal and informal guises, including national mass organizations created and funded by the CCP.

Authorities supported the growth of some civil society organizations that addressed social problems, such as poverty alleviation. However, authorities remained cautious that these organizations might emerge as a source of political opposition among disgruntled citizens. A student-led NGO called Xinjiang Snow Lotus, which advocated on behalf of AIDS and Hepatitis B patients, was shut down in October 2006 on the claim that it was not formally registered as an NGO. Snow Lotus' founder, Chang Kun, was expelled from his university. In November 2006 Shenzhen officials investigated 12 grassroots labor rights organizations that were working together to overturn a regulation concerning labor arbitration, ultimately shutting down two of them. A number of NGOs had support from foreign secular and religious NGOs, and several were able to undertake limited advocacy roles in public interest areas such as women's issues, the environment, health, and consumer rights. According to government guidelines, NGOs must not advocate nonparty rule, damage national unity, or upset ethnic harmony. Groups that disregarded guidelines and unregistered groups that continued to operate could face administrative punishment or criminal charges.

No laws or regulations specifically govern the formation of political parties. But the CDP remained banned, and the government continued to monitor, detain, and imprison current and former CDP members.

c  Freedom of Religion

The constitution and laws provide for freedom of religious belief and the freedom not to believe, although the constitution only protects religious activities defined as "normal." The government sought to restrict legal religious practice to government-sanctioned organizations and registered places of worship and to control the growth and scope of the activity of both registered and unregistered religious groups, including house churches. Religious groups must comply with a government-affiliated patriotic religious association (PRA) associated with one of the five recognized religions: Buddhism, Taoism, Islam, Protestantism, and Catholicism. The PRAs supervised the activities of each of these religious groups and liaised with government religious affairs authorities charged with monitoring religious activity. The government tried to control and regulate religious groups, particularly unregistered groups. Nonetheless, membership in many religious groups continued to grow rapidly.

The extent of religious freedom continued to vary widely within the country. Freedom to participate in officially sanctioned religious activity continued to increase in most areas. Religious activity grew not only among the five main religions, but also among the Eastern Orthodox Church and folk religions. Some unregistered groups continued to experience varying degrees of official interference and harassment. Severe crackdowns against unregistered Protestants and Catholics, Muslims, and Tibetan Buddhists continued, and the government increased its control over some peaceful religious practices. The level of repression of religious freedom in Tibetan areas increased, and there was some tightening of official control over religious freedom in the XUAR. The government also continued its severe repression of groups that it determined to be "cults," targeting the Falun Gong spiritual movement in particular.

All religious venues were required to register with the State Administration for Religious Affairs (SARA) or its provincial or local offices, which are known as Religious Affairs Bureaus (RABs). SARA and the RABs were responsible for monitoring and judging whether religious activity was "normal" and therefore lawful. SARA and the CCP's United Front Work Department provided policy guidance and supervision over implementation of government regulations on religious activity.

The 2005 regulations on religious affairs (RRA) delineated regulatory activities governing religious affairs and consolidated official pronouncements within a legal framework. The regulations protect the rights of registered religious groups, under certain conditions, to possess property, publish literature, train and approve clergy, and collect donations. However, the regulations have done little to expand religious freedom, as the activities of unregistered religious groups remain outside the scope of the RRA's legal protection. The regulations provide general protection only for freedom of "religious belief," but not expressions of belief, and merely codify past practices, including restrictions over officially recognized religious communities. The regulations protect only those religious beliefs categorized vaguely as "normal." In practice party doctrine guides the resolution of religious issues and the implementation of regulations. The regulations also give authorities broad discretion to define which religious activities are permissible.

The law requires religious groups to register places of worship. Spiritual activities in places of worship that have not registered may be considered illegal and participants can be punished. Government officials stated that private homes where family and friends meet to study the Bible would not be required to register, but venues for formal worship services should be registered, even if such formal worship takes place in a private home. Clergy need not be approved by the government but must be reported to the government after being selected pursuant to the rules of the relevant government-affiliated religious association. Pressure on religious groups to register or to come under the supervision of official religious organizations continued during the year. Some groups registered voluntarily, while some registered under pressure. Several groups avoided officials in an attempt to avoid registration, and the government refused to register some groups. Various unofficial groups reported that authorities refused them registration without explanation. The government contended that these refusals were mainly the result of failure to meet requirements concerning facilities and meeting spaces. Some religious groups were reluctant to comply with the regulations out of principled opposition to state control of religion or due to fear of adverse consequences if they revealed, as required, the names and addresses of church leaders and members.

Local authorities' handling of Protestant "house churches" varied in different regions of the country. In some regions unregistered house churches with hundreds of members met openly, with the full knowledge of local authorities, who characterized the meetings as informal gatherings. In other areas house church meetings of more than a handful of family members and friends were strictly proscribed. Leaders of unauthorized groups were sometimes the target of abuse. Authorities often disrupted house church meetings and retreats; detained, beat, and harassed leaders and church members; and confiscated the personal property of house church leaders and members. House churches were more likely to encounter difficulties when their membership grew, when they arranged for the regular use of facilities for the purpose of conducting religious activities, or when they forged links with other unregistered groups.

In February police and local RAB officials reportedly raided a prayer meeting at a private home in Jiangsu Province. When some of the individuals at the meeting refused to give their names, police reportedly beat them. Police also forced the owner of the home to sign a statement agreeing not to hold religious activities in his home. In March and December, authorities in Beijing and in several provinces reportedly detained and interrogated members of the China House Church Alliance about their connections to foreigners and about alleged plans to disrupt the 2008 Olympic Games.

In May police in Aksu, XUAR, reportedly arrested about 30 house church leaders who had met with overseas Christians. Six of the house church leaders were accused of involvement in "evil cult activities," and two were abused during interrogation. During a closed trial in June, a Beijing court sentenced house church activist Hua Huaqi to six months in prison for obstruction of justice. Police reportedly beat him in jail and poured cold water over him in frigid weather. In July and August, at least 17 house church leaders in eight provinces were reportedly detained as part of a "strike hard" campaign against unauthorized religious activity. Christian attorney Li Heping reported that, on September 29, a group of men ordered him to stop practicing law, beat him, and struck him with electric batons for nearly five hours. Li, who went into hiding after the attack, was a prominent advocate in religious freedom and human rights cases. On November 18, public security bureau officers in Henan detained 40 church leaders from the China Gospel Fellowship. In June 2006 Henan Province house church pastor Zhang Rongliang was convicted of obtaining a passport through fraud and of illegal border crossing and sentenced to prison.

Harassment of unregistered Catholic bishops, priests, and laypersons continued, including government surveillance and detentions. In March police detained Bishop Wu Qinjing, the bishop of Zhouzhi, Shaanxi Province. His whereabouts remained unknown. On March 9, a government document stated that Bishop Wu should not run any church affairs as a bishop or interfere with the Zhouzhi diocese management. In June police detained 73-year-old Jia Zhiguo, an underground bishop of the diocese of Zhengding, Hebei Province, and held him for 17 days in an unknown location. In July officials in Inner Mongolia detained three priests, Liang Aijun, Wang Zhong, and a third individual whose name has not been reported, who had fled from Hebei Province. On July 30, 82-year-old Bishop Yao Liang was arrested, and he remained in detention at year's end. In August Bishop Jia Zhiguo reportedly was again detained and held without charge until December 14. In September underground Bishop Han Dingxiang, who reportedly suffered from cancer and had been under house arrest or other forms of detention for nearly eight years, died at a hospital while under police custody. There was no new information about unregistered Bishop Su Zhimin, who has been unaccounted for since his detention in 1997. The government had not responded to reports that Bishop Su died in June 2006.

The government and the Holy See have not established diplomatic relations, and there was no Vatican representative on the mainland. The state-controlled Catholic Patriotic Association (CPA) does not recognize the authority of the Holy See to appoint bishops. However, while bishops continued to be appointed according to CPA rules, the CPA returned to its historical practice of allowing the Vatican's discreet and very limited involvement in selecting some bishops. The role of the pope in selecting bishops, the status of underground Catholic clerics, and Vatican recognition of Taiwan remained obstacles to improved relations, although there were some new efforts toward rapprochement between the government and the Vatican. In January the Vatican issued an invitation to the government to enter a dialogue on restoring diplomatic

relations and announced that it would set up a permanent commission to handle relations with the government  In June Pope Benedict XVI issued an open letter to Chinese Catholics inviting them to resolve differences and called for a "respectful and constructive dialogue" leading to normalized relations. The pope's letter was available online, although local authorities reportedly blocked some Web sites carrying the letter. A Ministry of Foreign Affairs spokesperson stated the government advocated improvement in relations.

In September Xiao Zejiang, who was a member of the Guizhou Provincial People's Political Consultative Conference, was ordained as coadjutor bishop of the Guizhou Diocese. Bishop Xiao's ordination was the first of five ordinations approved both by Beijing and the Vatican following the pope's June letter to Chinese Catholics  Previously, in 2006 Wang Renlei, Ma Yingling, and Liu Xinhong were appointed as bishops without the approval of the Holy See.

In some official Catholic churches, clerics lead prayers for the pope and pictures of the pope were displayed  An estimated 90 percent of official Catholic bishops have reconciled with the Vatican.

Traditional folk religions, such as Fujian Province's "Mazu cult," were still practiced in some locations  They were tolerated to varying degrees, often seen as loose affiliates of Taoism or as ethnic minority cultural practices  However, the government labeled folk religions "feudal superstition" and sometimes repressed them. SARA established a new administrative division responsible for the activities of folk religions and religions outside the main five, including the Eastern Orthodox Church and the Church of Jesus Christ of Latter-day Saints

Buddhists made up the largest body of organized religious believers. The traditional practice of Buddhism continued to expand among citizens in many parts of the country. However, the government created an increasing repressive environment for the practice of Tibetan Buddhists. The intensity of religious repression against Tibetan Buddhists varied across regions  Two new sets of legal measures increased the legal basis for repression. On January 1, the TAR implemented the PRC Religious Affairs Management Regulations, which are more restrictive than the TAR's previous 1991 regulations. The new regulations assert state control over nearly all aspects of Tibetan Buddhism, from the management of monasteries to the movement of monks and nuns  On September 1, another set of new regulations went into effect, empowering the party and the government to approve all reincarnate lamas, the top leaders of Tibetan Buddhism  With the implementation of this new measure, the government attempted to control a vital feature of Tibetan Buddhism, the lineages of the reincarnated Buddhist teachers that span centuries (see Tibet Addendum). In Tibetan areas of Sichuan and Qinghai, a "religious education campaign" coerced Tibetans into denouncing the Dalai Lama and forced parents to withdraw their children from monasteries where they were receiving a Tibetan education and put them in regular Chinese elementary schools. Other government restrictions used to justify repression remained, particularly where the government interpreted Buddhist belief as supporting separatism, such as in some Tibetan areas and parts of the inner Mongolian Autonomous Region. Authorities continued to try to prevent Tibetans from leaving the country to obtain a religious education, under the guise of promoting stability by thwarting separatists. From June 29 to July 5, envoys of the Dalai Lama met with government officials, in the sixth round of dialogue between the two sides since 2002 (see Tibet Addendum).

The government tightly controlled the practice of Islam, and official repression in the XUAR targeted at Uighur Muslims tightened in some areas. Regulations restricting Muslims' religious activity, teaching, and places of worship continued to be implemented forcefully in the XUAR  The government continued to repress Uighur Muslims, sometimes citing counterterrorism as the basis for taking action that was repressive. XUAR authorities detained and arrested persons engaged in unauthorized religious activities. The government reportedly continued to limit access to mosques, detain citizens for possession of unauthorized religious texts, imprison citizens for religious activities determined to be "extremist," force Muslims who were fasting to eat during Ramadan, and confiscate Muslims' passports in an effort to strengthen control over Muslim pilgrimages. In addition the XUAR government maintained the most severe legal restrictions in China on children's right to practice religion  In recent years XUAR authorities detained and arrested persons engaged in unauthorized religious activities and charged them with a range of offenses, including state security crimes  Xinjiang authorities often charged religious believers with committing the "three evils" of terrorism, separatism, and extremism  XUAR authorities prohibited women, children, CCP members, and government workers from entering mosques.

Local officials reportedly arrested or expelled as many as 84 foreign citizens on charges of "illegal religious activity." Local authorities in the XUAR reportedly also committed one associate of expelled foreign citizens to two years of reeducation through labor for assisting the foreigners with conducting "illegal religious activities "  Authorities reportedly detained another associate for violating an order that limits proselytizing in XUAR

The state-controlled Islamic Association of China (IAC) aligned Islamic practice to CCP goals. However, in contrast to the heavy-handed approach to Muslims in the XUAR, officials in Ningxia, Gansu, Qinghai, and Yunnan provinces approached religious affairs cautiously and were reluctant to interfere overtly in Muslims' activities  Authorities reserved the right to censor imams' sermons, and imams were urged to emphasize the damage caused to Islam by terrorist acts in the name of the religion  Certain Muslim leaders received particularly harsh treatment. Authorities conducted monthly political study sessions for religious personnel, and the program continued through the year  Authorities also reportedly tried to restrict Muslims' opportunities to study religion overseas. The China Islamic Conference required religious personnel to study "new collected sermons" compiled by an IAC committee, including messages on patriotism and unity aimed at building a "socialist harmonious society "

In addition to the restrictions on practicing religion placed on party members and government officials throughout the country, teachers, professors, and university students in the XUAR were sometimes not allowed to practice religion openly. A local party secretary, Zhang Zhengrong, reportedly called on schools to strengthen propaganda education during Ramadan and to put a stop to activities including fasting and professing a religion  The Kashgar Teachers College reportedly implemented a series of measures to prevent students from observing Ramadan, including imposing communal meals and requiring students to obtain permission to leave campus. School authorities also made students gather for a school assembly at a time of day coinciding with Friday prayers.

In 2006 the IAC established an office to manage the hajj pilgrimages, and the government took steps to prevent Muslims from traveling on unauthorized pilgrimages  The government continued to enforce a policy barring Muslims from obtaining hajj visas outside of China. The government reportedly published banners and slogans discouraging hajj pilgrimages outside those organized by the IAC  Foreign media reported that XUAR officials confiscated the passports of an unknown number of Uighur Muslims in an effort to prevent unauthorized hajj pilgrimages  Foreign media reported that some Uighur Muslims were told they would have to pay a deposit of $7,000 (RMB 50,000) to retrieve their passports for overseas travel. Government officials in some areas also arbitrarily detained Muslims to prevent them from going on the hajj, required them to show that their hajj travel funds were not borrowed from other sources, and required them to pass a health test.

Official reports noted that 10,804 Chinese Muslims traveled to Mecca for the 2006-7 hajj pilgrimage. This figure did not include participants who were not organized by the government, for whom there were no official estimates but who numbered in the thousands in previous years.

The law does not prohibit religious believers from holding public office; however, party membership is required for almost all high-level positions in government, state-owned businesses, and many official organizations  CCP officials stated that party membership and religious belief were incompatible and that religious believers should resign their party membership. However, in a December 18 Politburo collective study on religion, President Hu Jintao emphasized the positive role of religion in building a harmonious society and noted that the 17th Communist Party Congress stressed the need to bring into play the role of religion "in promoting economic and social development." The PLA Routine Service Regulations state explicitly that service members "may not take part in religious or superstitious activities." CCP and PLA personnel have been expelled for adhering to Falun Gong beliefs

Despite regulations encouraging officials to be atheists, some party officials engaged in religious activity, most commonly Buddhism or a folk religion. The NPC included several religious representatives. Religious groups also were represented in the CPPCC, an advisory forum for "multiparty" cooperation and consultation led by the CCP, and in local and provincial governments. CPPCC Standing Committee vice chairmen included Pagbalha Geleg Namgyal, a Tibetan reincarnate lama, and Cao Shengjie, president of the China Christian Council

The authorities permitted officially sanctioned religious organizations to maintain international contacts that do not involve "foreign control." However, what constitutes "control" is not defined. Regulations on religious practice by foreigners include a ban on proselytizing  Authorities generally allowed foreign nationals to preach to other foreigners, bring in religious materials for personal use, and preach to citizens at the invitation of registered religious organizations  Despite a ban on missionary activities, many foreign Christians teaching on college campuses openly professed their faith with minimum interference from authorities provided their religious activity remained discreet. Authorities permitted citizens who joined the Church of Jesus Christ of Latter-day Saints while outside of China to hold services after their return.

The authorities continued a general crackdown on groups considered to be "cults." These "cults" included not only Falun Gong and various traditional Chinese meditation and exercise groups (known collectively as qigong groups), but also religious groups that authorities accused of preaching beliefs outside the bounds of officially approved doctrine.

Actions against members of such groups continued during the year. In spring police in Liaoning Province sentenced Gu Changrong and Gu Zhaohong, members of the Society of Disciples, to one-year terms of reeducation-through-labor for allegedly preaching to a local CCP member. Police confiscated several Bibles from the home of Gu Zhaohong. Police also continued efforts to close down the underground evangelical group Shouters, an offshoot of a pre-1949 indigenous Protestant group. Government action against the South China Church (SCC) founder Gong Shengliang and other imprisoned SCC members reportedly continued to suffer serious abuses and poor health in prison. Gong was serving a life sentence for rape, arson, and assault, even though the women who testified against him in his original trial in 2001 reported that police had tortured them into signing statements accusing Gong of raping them.

Public Falun Gong activity in the country remained negligible, and practitioners based abroad reported that the government's crackdown against the group continued. In the past, the mere belief in the discipline (even without any public practice of its tenets) sometimes was sufficient grounds for practitioners to receive punishments ranging from loss of employment to imprisonment. Falun Gong sources estimated that since 1999 at least 6,000 Falun Gong practitioners have been sentenced to prison, more than 100,000 practitioners sentenced to reeducation-through-labor, and almost 3,000 died from torture while in custody. Some foreign observers estimated that Falun Gong adherents constituted at least half of the 250,000 officially recorded inmates in reeducation-through-labor camps, while Falun Gong sources overseas placed the number even higher. In the past, many practitioners were detained multiple times.

Over the past several years, Falun Gong members identified by the government as "core leaders" were singled out for particularly harsh treatment. More than a dozen Falun Gong members were sentenced to prison for the crime of "endangering state security," but the great majority of Falun Gong members convicted by the courts since 1999 were sentenced to prison for "organizing or using a sect to undermine the implementation of the law," a less serious offense. Most practitioners, however, were punished administratively. Some practitioners were sentenced to reeducation-through-labor. Among them, Yuan Yuju and Liang Jinhui, relatives of a Hong Kong journalist working for a television station supportive of Falun Gong, were sentenced to reeducation-through-labor for distributing Falun Gong materials. Some Falun Gong members were sent to "legal education" centers specifically established to "rehabilitate" practitioners who refused to recant their belief voluntarily after their release from reeducation-through-labor camps. Government officials denied the existence of such "legal education" centers. In addition hundreds of Falun Gong practitioners were confined to mental hospitals, according to overseas groups.

Police continued to detain current and former Falun Gong practitioners and used possession of Falun Gong material as a pretext for arresting political activists. In March Chi Jianwei, a member of the CDP, was sentenced to three years in prison for using a cult to undermine implementation of the law, reportedly after authorities found Falun Gong material at his house. In April 2006 Pastor Cui Xin, an elderly resident of Harbin, began serving seven years' imprisonment for her involvement with Falun Gong. Police confiscated Falun Gong materials from Cui's home following her arrest in December 2006. The government continued its use of high-pressure tactics and mandatory anti-Falun Gong study sessions to force practitioners to renounce Falun Gong. Even practitioners who had not protested or made other public demonstrations of belief reportedly were forced to attend anti-Falun Gong classes or were sent directly to reeducation-through-labor camps. These tactics reportedly resulted in large numbers of practitioners signing pledges to renounce the movement.

The government supported atheism in schools. In March 2005 a Foreign Ministry spokesperson said the country had no national regulations preventing children from receiving religious instruction but said religion should not interfere with public education. In practice local authorities in many regions barred school-age children from attending religious services at mosques, temples, or churches and prevented them from receiving religious education outside the home.

Official religious organizations administered local religious schools, seminaries, and institutes to train priests, ministers, imams, Islamic scholars, and Buddhist monks. Students who attended these institutes had to demonstrate "political reliability," and all graduates must pass an examination on their political, as well as theological, knowledge to qualify for the clergy. The government permitted registered religions to train clergy and allowed an increasing number of Catholic and Protestant seminarians, Muslim clerics, and Buddhist clergy to go abroad for additional religious studies, but some religion students had difficulty getting passports or obtaining approval to study abroad. In most cases foreign organizations provided funding for such training programs.

Authorities continued to prohibit the teaching of Islam to elementary and middle school-age children in some areas, although children studied Arabic and the Koran without restriction in many others. Local officials stated that school-age children may not study religion or enter mosques in the XUAR.

Although Bibles and other religious texts were available in most parts of the country, the government tightly regulated the publication of religious texts and prohibited individuals from printing religious material. The 2005 religious regulations permits authorized religious organizations and venues to compile and print materials for internal and public distribution but requires publications to be prepared in accordance with national regulations. These regulations, in turn, impose strict prior restraints on religious literature, even beyond the restrictions on other types of publications. The regulations also provide for government oversight of the appointment of religious personnel.

On August 31, house church leader Zhou Heng was detained in the XUAR for "illegal business operation." Zhou reportedly had imported three tons of Bibles from South Korea, and he remained in prison at year's end. In April 2006 Pastor Liu Yuhua from Shandong was detained in Linchu County on charges of operating an illegal business after he was found distributing religious texts. In July 2005 Protestant Pastor Cai Zhuohua and two other relatives were sentenced to prison for operating an illegal business, stemming from their large-scale publishing of Bible and Christian literature without government approval.

According to media reports during the year, XUAR authorities also confiscated 25,000 illegal religious publications. In February 2006 XUAR authorities reportedly raided a minority-language printing market and seized "illegally printed" religious posters. Also in February authorities announced that in 2005 they had seized 9,860 illegal publications involving religion, Falun Gong, or "feudal superstitions." The Xinjiang People's Publication House was the only publisher officially permitted to print Muslim literature.

The supply of Bibles was adequate in most parts of the country, but some members of underground churches complained that the supply and distribution of Bibles, especially in rural locations, was inadequate. Individuals could not order Bibles directly from publishing houses. Customs officials continued to monitor for the "smuggling" of religious materials into the country. Authorities in a few areas reportedly sometimes confiscated Bibles, Korans, and other religious material.

Societal Abuses and Discrimination

There were no reports of societal abuses of religious practitioners or anti-Semitic acts during the year. The government does not recognize Judaism as an ethnicity or religion.

For a more detailed discussion, see the 2007 International Religious Freedom Report.

d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The law provides for some of these rights; however, the government generally did not respect them in practice. Although the government maintained restrictions on the freedom to change one's workplace or residence, the national household registration system continued to erode, and the ability of most citizens to move within the country to work and live continued to expand. Authorities heightened restrictions periodically, particularly curtailing the movement of individuals deemed politically sensitive before key anniversaries, visits of foreign dignitaries, and to forestall demonstrations.

The system of national household registration (hukou) underwent further change during the year. Rural residents continued to migrate to the cities, where the per capita disposable income was more than quadruple the rural per capita income, but many could not officially change their residence or workplace within the country. Most cities

had annual quotas for the number of new temporary residence permits that would be issued, and all workers, including university graduates, had to compete for a limited number of such permits. It was particularly difficult for peasants from rural areas to obtain household registration in more economically developed urban areas.

The household registration system added to the difficulties rural residents faced even after they relocated to urban areas and found employment. In March 2006 the National Bureau of Statistics estimated that there was a floating population of 147.35 million, nearly one-third of which moved between provinces. These economic migrants lacked official residence status in cities, and it was difficult or impossible for them to gain full access to social services, including education. Furthermore, law and society generally limited migrant workers to types of work considered least desirable by local residents, and such workers had little recourse when subjected to abuse by employers and officials. Some major cities maintained programs to provide migrant workers and their children access to public education and other social services free of charge, but migrants in some locations reported that it was difficult to qualify for these benefits in practice.

Many cities and provinces continued experiments aimed at further eroding the distinction between urban and rural residents in household registration documents. At the beginning of the year, the Shenzhen Special Economic Zone delinked the right to participate in the public pension system from workers' hukou status, allowing all workers who have lived in the zone for 15 years and contributed to the pension system to claim benefits.

Under the "staying at prison employment" system applicable to recidivists incarcerated in reeducation-through-labor camps, authorities denied certain persons permission to return to their homes after serving their sentences. Some released or paroled prisoners returned home but were not permitted freedom of movement.

The government permitted legal emigration and foreign travel for most citizens. Most citizens could obtain passports, although those whom the government deemed threats, including religious leaders, political dissidents, and some ethnic minority members continued to have difficulty obtaining passports (see Tibet Addendum). There were reports that some academics faced travel restrictions around the year's sensitive anniversaries, particularly the June 4 anniversary of the Tiananmen Square massacre. There were instances in which the authorities refused to issue passports or visas on apparent political grounds. Members of underground churches, Falun Gong members, and other politically sensitive individuals sometimes were refused passports or otherwise prevented from traveling overseas. In February local authorities blocked prominent HIV/AIDS activist Dr. Gao Yaojie from traveling overseas to receive a human rights award. Following international pressure, authorities relented. On August 24, authorities in Beijing reportedly confiscated the passport of Yuan Weijing to prevent her from traveling overseas to receive a human rights award for her imprisoned husband, legal activist Chen Guangcheng. Also in August authorities denied rights lawyer Zheng Enchong's application for a passport to travel to Hong Kong and Macau. They had previously told Zheng to stop opposing the government and working with human rights groups in Hong Kong.

The law neither provides for a citizen's right to repatriate nor otherwise addresses exile. The government continued to refuse reentry to numerous citizens who were considered dissidents, Falun Gong activists, or troublemakers. Although some dissidents living abroad were allowed to return, dissidents released on medical parole and allowed to leave the country often were effectively exiled. Activists residing abroad were imprisoned upon their return to the country.

Some 2,445 Tibetans reportedly fled Tibetan areas for India in 2006, most of them teenagers and novice monks and nuns seeking religious education. Police vowed to "strike hard" against such border crossings as part of a campaign against "separatists." While the UN High Commissioner for Refugees (UNHCR) reported that more than 2,000 Tibetans each year crossed into Nepal, the government continued to try to prevent many Tibetans from leaving and detained many who were apprehended in flight (see Tibet Addendum).

Protection of Refugees

Although the country is a signatory of the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, the law does not provide for the granting of refugee or asylum status. The government largely cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) when dealing with the resettlement of ethnic Han Chinese or ethnic minorities from Vietnam and Laos resident in the country. During the year the government and UNHCR continued ongoing discussions concerning the granting of citizenship to these residents. However, the government continued to deny the UNHCR permission to operate along its northeastern border with North Korea, arguing that North Koreans who crossed the border were illegal economic migrants, not refugees.

The government did not provide protection against refoulement, the return of refugees to a country where there is reason to believe they face persecution. During the year authorities continued to detain and forcibly return North Koreans to North Korea, where many faced persecution and some may have been executed upon their return. Some North Koreans were permitted to travel to third countries after they had entered diplomatic compounds or international schools in the country. There were numerous reports of harassment and detention of North Koreans in the country. The children of some North Korean asylum seekers and of mixed couples (i.e., one Chinese parent and one North Korean parent) reportedly did not have access to health care or education. The government also arrested and detained journalists, missionaries, and activists, including some citizens, who provided food, shelter, transportation, and other assistance to North Koreans. In February police reportedly arrested a foreign national who arranged for five North Korean asylum seekers to travel to South Korea. According to reports, activists or brokers helping North Koreans were charged with human smuggling, and the North Koreans were forcibly returned to North Korea. There were also reports that North Korean agents operated within the country to forcibly repatriate North Korean citizens.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law does not provide citizens with the right to change their government peacefully, and citizens cannot freely choose or change the laws and officials that govern them. The CCP continued to control appointments to positions of political power.

Elections and Political Participation

According to the law, the NPC is the highest organ of state power. Formally, it elects the president and vice president, selects the premier and vice premiers, and elects the chairman of the State Central Military Commission. In practice the NPC Standing Committee, which is composed of 159 members, oversaw these elections and determined the agenda and procedure for the NPC. The NPC Standing Committee remained under the direct authority of the CCP's nine-member Politburo Standing Committee. Despite its broad authority under the state constitution, the NPC does not have power independently to set policy or remove political leaders without the party's approval. In 2003 the NPC confirmed CCP General Secretary Hu Jintao as president, and in 2004 Hu consolidated his power when he was also appointed chairman of the Central Military Commission.

All of the country's approximately one million villages were expected to hold competitive, direct elections to select members of local village committees, which are subgovernment organizations. In June the Ministry of Civil Affairs reported that villages in all 31 provincial-level jurisdictions had held at least two rounds of elections since 1998. Although international monitors who previously observed local village committee elections judged those they observed to have been generally fair, during the year these same monitors reported that officials increasingly resisted allowing them to observe the quality, procedural integrity, and fairness of the village elections. The government estimated that one-third of all elections had serious procedural flaws. Corruption, vote buying, and interference by township-level and party officials continued to be problems. The law permits each voter to cast proxy votes for up to three other voters. Many rural voters cast the maximum number of proxy votes, especially in areas with significant out-migration.

Although the law includes a provision for recalling village committee members, local implementing regulations proved sufficiently vague or cumbersome so as to prevent most attempted recalls. In cases of alleged corruption, a handful of local legislative deputies, but not village heads, were recalled. In 2005 villagers in Guangdong Province's Taishi village were subjected to severe abuse when they tried to recall village chief Chen Jinsheng, whom they accused of embezzling village funds. Authorities resorted to violence, intimidation, and other tactics to quash the recall attempt.

The election law governs elections of legislative bodies at all levels. Under this law, citizens have the opportunity to vote for local people's congress (LPC) representatives

# China Aid

Who are we? Chinese Site

Persecution in China
- o Overview
- o History of Persecution in China
  Stones of Persecution
  - ■ Overview
- o  ■ Story Archive
- o The Underground Church
- • o Rights Defenders in China

Find out what YOU can do »
Story Archive



# Xu Shuangfu: Precious is the death of His saints

Posted Apr 12 2007



Xu Shuangfu (60) founded the Three Grades of Servants church group, which has more than 500,000 members throughout China  Over the years, the Chinese government has vigorously persecuted this church, imprisoning hundreds of members and killing at least 15 Xu Shuangfu served more than a decade in labor camps and prisons since 1976, primarily for "illegal evangelizing activities "

In April 2004, Xu was kidnapped, along with 90 other leaders of the group  Xu was accused of ordering 16 church leaders to murder 20 leaders of the Eastern Lightning Group in 2002  He also was accused of defrauding his congregation of more than 30 million Yuan (US$4 million)

The Eastern Lightning cult was founded by a woman named Zheng, who claims to be China's female reincarnation of Jesus Christ  The group has been accused of using kidnappings, violence and seduction to steal members.

> When Xu's confession was read during his trial, he recanted, testifying that it was extracted by torture

"Eastern Lightning is a mafia group with Christian uniforms,"   said Christian Aid president, Bob Fu.

During interrogation, the arrested church leaders maintained their innocence and were tortured extensively, resulting in the death by torture of Gu Xianggao

Finally, however, Xu and others were forced to sign confessions  When Xu's confession was read during his trial, he recanted, testifying that it was extracted by torture.

Along with sleep deprivation and severe beatings with iron links and clubs, a mixture of hot pepper, gasoline and ginger juice was poured into his nostrils. He was hanged from the ceiling, first with his bound wrists above his head and then with his arms stretched and forced between his legs, front to back  His fingers, toes and genitals were shocked and burned with electric batons  And he was forced to wear a "noise helmet"   which emits a range of loud, excruciating sounds.

Despite the illegality of the torture and the lack of any evidence against the accused other than forced confessions, Xu Shuangfu, Li Maoxing (55) and Wang Jun (36) were found guilty and condemned to death. Ms. Zhang Min (35), Ms. Zhu Lixin (27) and Ben Zhonghai received two-year suspended death sentences. The remaining 11 received prison sentences ranging from 3 to 15 years

The three church leaders were secretly executed the last week of November 2006  Lawyers and relatives were not informed of the executions until after the bodies had been cremated. Bob Fu believes the bodies were destroyed by the government to dispose of physical evidence of torture

## Comments

## 2 Responses to "Xu Shuangfu: Precious is the death of His saints"

1.  *Mark Bjorndal* Says:
    November 12th, 2007 at 11 22 pm

08 0991

FILED

JUN - 9 2008

Clerk, U.S. District and
Bankruptcy Courts

God knows the heart, so whether we sign a confession or not, this has nothing to do with our salvation. Peter denied Jesus 3 times but by His grace and grace alone, Peter is in heaven now with Jesus and so will we all be. Be encouraged, God is not mocked. We will all stand in the end. Those who do things in secret will be found out in public whether now or later. It will come to pass. God will bring about justice in His time. Pray for them and their families as well. Be blessed. Mark

2.  *Ben* Says:
    April 18th, 2008 at 1 07 am

    This story just makes me realize how much freedom we have in the U S and how much we take it for granted. I pray that God will give me as much courage and wisdom to share the gospel with others. Paul wrote to the early churches while in prison to say that he was glad that his persecution encouraged other Christian brothers and sisters to be more bold

## Leave a Reply

Name (required)

Mail (will not be published) (required)

Website

Submit Comment

## Spread the Word Share this Article with a Friend

## Related Messages View More >

- Chen Jingmao: Penalty for good deeds
- Ren Daoyun: Crime of hospitality
- Xianzhi Liu: For the joy set before her, despising the shame
- Ma Yuquin: Worthy of the Kingdom
- Li Ming: Targeting the shepherds
- Cai Zhuohua: People of the Book
- Jiang Zongxiu Cover-up for murder

## Meet Our Founder

As the "Countdown Clock" on Tian'anmen Square ticked backwards toward the July 1 takeover of Hong Kong, Bob Fu and his pregnant wife, Heidi, knew their time was running out, too . Learn More >

Contact Us | Accountability | Privacy Policy Chinese Site >
China Aid Association. Copyright 2007. All Rights Reserved.

Religious Freedom Index >>
Designed and Developed by Trinet Internet Solutions

http //chinaaid org/2007/04/12/xu-shuangfu-precious-is-the-death-of-his-saints/

# The Epoch Times



THE LARGEST BUSINESS SHOW IN NEW YORK
November 29th 2006 • Jacob K. Javits Center, New York, NY

| Home | | Subscribe | Print Edition | Advertise | National Editions | Other Languages | | Search |

**Home**
Nation
World
China
Business
Opinion
Life
Health
Science & Technology
Arts & Entertainment
Sports

Features
Nine Commentaries on the Communist Party
NTDTV 2007 Chinese Spectacular
Organ Harvesting in China
Gao Zhisheng
Hunger Strikes for China
Bird Flu
Quitting the CCP
Epoch Times Reporters Jailed in China
The Real Story of Jiang Zemin
Previous Features


Murphy's In-Law

Advertisement


The Epoch Times

Nine Commentaries on the Communist Party

Read why millions of people are rapidly quitting the Chinese Communist Party

Home > China | Topic: Human Rights

🖶 Printer version | ✉ E-Mail article | ✍ Give feedback

## Three Christians in China Secretly Executed

**By Xin Fei**
**Epoch Times Staff**

Nov 29, 2006



(Getty Images)

RELATED ARTICLES

- House Church Destroyed in Zhejiang Tuesday, August 01, 2006
- Nearly 2,000 Christians Arrested in China Every Year Wednesday, July 05, 2006
- 28 House Church Pastors Detained in Henan for Independent Religious Service Thursday, June 08, 2006
- Chinese Christians Tell America About Hardships in Red China Monday, May 08, 2006
- China's Abysmal Human Rights Situation Worsening Sunday, April 23, 2006
- Christian Leaders Detained in Raids Across China Wednesday, March 22, 2006
- Communist Regime Bans People Under 18 From Attending Mosques in Xinjiang, China Monday, February 13, 2006
- Nearly 50 House Church Leaders Arrested in Hebei; Some Beaten Thursday, October 20, 2005
- The Persecution of Faith in China Tuesday, September 13, 2005
- Beijing Church Leader Put on Trial; Relatives and US Embassy Official Blocked Thursday, July 07, 2005
- Nationwide Crackdown on House Churches in China Wednesday, June 29, 2005

Xu Shuangfu, Li Maoxing and Wang Jun, leaders of the "Three Grades of Servants" underground church, were secretly executed for murder last week by the Chinese communist regime. Xu Shuangfu's attorney Li Heping received a phone call from the court and learned this news.

This case was internally referred to as the "Thunder No. 1" big case within the Ministry of Public Security. This case has involved as many as 63 people. It started in March 2003, and spread to Shandong, Jiangxi, Sichuan and another seven provinces. To date, 22 people have been sentenced to death, and 12 more people have been executed.

While being interviewed by *The Epoch Times*, Attorney Li Heping said, "Today the court called me to ask for my address, saying that they need to mail me the final judgment paper. I asked for the status of this case. The judge said that the people were executed last week. I was very shocked. We have not obtained the final judgment paper nor have the family members been able to see the defendants, but they have already been executed. This is indeed too out of control."

Neither the attorney nor the reporter could contact the family of Xu Shuangfu. According to some insiders, because Xu's sister exposed the torture her brother received in jail, she has been tortured to the point of mental breakdown and was arrested and detained in jail.

Li Maoxing's wife told *The Epoch Times* that she received the phone call from Shuangya Middle Court, telling her to go to the court immediately to get Li's ashes. She grieved, "I have not gone to get the ashes, I can't take this anymore, and I don't want to go anyway."

## Brief Introduction to the Case

"Three Grades of Servants" is a denomination of the underground church in China, with a reported number of over half a million followers in China. The leader of the denomination, Xu Shuangfu, was accused of illegal missionary work and organizing evil cult activities and sent to a labor camp and sentenced to over ten years in prison.

In April 2004, the Administration of Justice of Heilongjiang Province accused Xu Shuangfu, Li Maoxing and other people as being involved in intentionally killing 20 members from the "Lightning from the East" denomination, as well as being involved in fraud and other crimes. Over ten attorneys from Beijing and Shandong and Helongjiang provinces have been defending the accused.

This March, after three and a half days of trailing at the Shuangya Municipal Middle Court, the trial concluded. Several defendants revealed their experience of being interrogated with inhumane torture.

This July, the first court hearing sentenced Xu Shuangfu and another three people to death. The other three were sentenced to 15 years in prison. From October 17 to 19, the Heilongjiang Provincial High Court held the second hearing on this case at the Shuangya Municipal Middle court.

## Attorney: Defendants were Innocent

Attorney Li Heping said, "All the defendants in this case were Christians. The defendants were accused of committing crimes while their religion was not mentioned. I think there is a problem here."

He said that the evidence presented was illegal, severely lacking and that the legal processes were not followed. Many defendants were seriously tortured while being interrogated. Xu Shuangfu and other defendants were tortured many times. Every time, the torture was aimed at forcing the defendant to admit to fabricated stories. If the defendant refused to admit, the torture would not stop. Sometimes, the defendant's hand was directly pulled to make a signature or fingerprint, and some were even tortured to death during the process.

Li Heping said that the so-called evidence used by the court to accuse the defendants was actually the oral confession forced out of them during the duress of torture. According to certain rules in criminal litigation law, the case can't be judged based only on oral statements. It is also illegal for illegally obtained evidence to be used in court.

According to Li Heping, Xu Shuangfu firmly denied all the charges. He denied his oral confession in the court, saying he was interrogated with torture and that he was beaten to admit everything. He firmly stated that he had nothing to do with the murder case. He emphasized that killing is forbidden by God. Li Maoxing defended himself saying, "If a person killed someone but was not even at the scene, how could he be accused of murder?"

中文 Click here to read the original article in Chinese

The Epoch Times

Choose your edition | About Us | Contact Us | Site Map | Privacy Policy | RSS Feeds
Copyright 2000 - 2005 Epoch Times International

## Fundamental Principles of Olympism

1  Olympism is a philosophy of life, exalting and combining in a balanced whole the qualities of body, will and mind  Blending sport with culture and education, Olympism seeks to create a way of life based on the joy of effort, the educational value of good example and respect for universal fundamental ethical principles

2  The goal of Olympism is to place sport at the service of the harmonious development of man, with a view to promoting a peaceful society concerned with the preservation of human dignity

3. The **Olympic** Movement is the concerted, organised, universal and permanent action, carried out under the supreme authority of the IOC, of all individuals and entities who are inspired by the values of Olympism  It covers the five continents  It reaches its peak with the bringing together of the world's athletes at the great sports festival, the **Olympic** Games  Its symbol is five interlaced rings

4  The practice of sport is a human right. Every individual must have the possibility of practising sport, **without discrimination of any kind and** in the **Olympic** spirit, which requires mutual understanding with a spirit of friendship, solidarity and fair play. **The organisation, administration** and management of sport must be controlled by independent sports organisations

5  Any form of discrimination with regard to a country or a person on grounds of race, religion, politics, gender or otherwise is incompatible with belonging to the **Olympic** Movement

6  Belonging to the **Olympic** Movement requires compliance with the **Olympic** Charter and recognition by the IOC





FILED
JUN - 9 2003
Clerk, U.S. District and
Bankruptcy Courts

11

# Ahead of Olympics, Beijing Crackdown Extends to Falun Gong Followers

*Nishika Patel | 01 Apr 2008; **World Politics Review Exclusive***
http://www.worldpoliticsreview.com/articlePrint.aspx?ID=1875

> ALL-STATE LEGAL®
> Exhibit
> #5

HONG KONG -- As Beijing cracks down on protestors in Tibet in the run up to the Olympics, adherents of Falun Gong -- a banned religious movement that draws from Buddhism and Taoism -- are also facing the heavy hand of the Communist regime.

Falun Gong members claim Chinese authorities are stepping up their crackdown on the group, branded an "evil cult" by Beijing, by using Olympic security as an "excuse."

In early March, the U.S.-based Falun Dafa Information Center announced that 1,878 practitioners from 29 provinces had been arrested since January 2008 and that cash rewards of up to $360 were being offered by the government to identify members. Followers believe the recent arrests were triggered by a secret order issued by former Public Security Minister Zhou Yongkang to provincial security forces in February this year. According to Amnesty International, the order was couched as crucial to "successfully" holding the Olympic Games.

"We must strike hard at hostile forces at home and abroad, such as ethnic separatists, religious extremists, violent terrorists and . . . the Falun Gong," Zhou ordered, according to an Amnesty International translation of the document.

"The Olympics seem to have given the Beijing regime a new incentive, and excuse, to hasten its abuses of citizens' rights. The arrests make a mockery of the regime's promise to improve its dismal record on human rights," said Erping Zhang of the the Falun Dafa Information Center, which collected the details of the arrests.

Dozens of members have been rounded up from Beijing's Chaoyang District, which will host the beach volleyball and tennis events, and the city's Shunyi district, the site of the Olympic rowing and kayaking venues. About 156 followers were seized in Beijing alone, the center claims.

In some cities, announcements of cash rewards are posted in neighborhood administration offices or Web sites run by the security bureau. The systematic nature of the arrests suggests that the authorities are using a previously compiled list of local followers, Falun Gong adherents say. There is a widespread fear for the lives and safety of the arrested members, who are thought to have been sent to re-education labor camps until after the end of the Olympics. Some were arrested in their workplaces or homes for holding Falun Gong literature.

08 0991

The arrest, disappearance and torture of Falun Gong members has been widely reported by human rights groups. Seven years after landmark protests in Tiananmen Square in 1999, a two-month investigation by a former Canadian Secretary of State and a Canadian human rights lawyer concluded that the organs of some arrested Falun Gong members had been harvested.

Hong Kong Association of Falun Dafa spokesman Kan Hung-cheung told World Politics Review that the increased arrests of practitioners is part of a drive to "stamp out" the movement. Falun Gong members say the government's effort to eradicate the movement began in 1999 under former

**FILED**

president Jiang Zemin, who they say vowed to accomplish that goal in three months.

"The Falun Gong will be in deep trouble over the next few months," said political commentator James Sung Lap-kung of Hong Kong City University. "Beijing considers the Falun Gong to be a partner in the recent Tibet riots. As the Olympics draw closer, Beijing will be trying to identify dangerous forces that are planning to jeopardize the Games."

But Kan said the recent arrests will not scare or deter practitioners from "telling the world the truth." "Falun Gong is the first target of Beijing because it is so afraid that we will tell people the truth about the persecution, even though we are peaceful," he said. "In the run up to the Olympics we won't miss the chance to tell people about our suffering, including those from other countries. But this doesn't mean we will disrupt any activities of the Olympics."

There are no firm plans for the group to protest in Beijing during the Olympics. Instead they will work with their foreign members to contact Western governments, parliament members and human rights groups to pressure Beijing.

The Human Rights Torch Relay, a global campaign to call attention to human rights abuses in China, has already started its journey to 40 countries and 150 cities. And recent events in Tibet are likely to make the government even more anxious of critical voices.

"Tibet shows the violence exercised by the Chinese Communist Party and that they will use bloodshed to stop the uprising of the Tibetans," said Kan. "The CCP won't let go of their power," said Kan.

The suppression of the Falun Gong began soon after the movement first sprung to life in 1992. It soon became a thorn in the side of the Communist regime, which saw the group's estimated 100 million members worldwide as a threat to their socialist ideology and to the Communist Party. According to party sources, the Chinese Communist Party has about 70 million members, about the same number of members Falun Gong claims in China.

Chinese state-run media has played a significant role in the Chinese government's campaign to discredit the movement.   Chinese media reports made much of an incident in Tiananmen Square in 2001, when some supposed Falun Gong members immolated themselves in front of a CNN camera crew. Later investigations by Western media outlets cast doubt on Chinese government claims that the suicide victims were members of Falun Gong, raising suspicions in some circles that the event had been staged as propaganda.

The Falun Gong has also been ridiculed for belief in the supernatural and aliens, as well as claims by its founder Li Hongzhi that he can perform miracle cures and levitate. Li is now living in exile in New York.  But the group says their beliefs are based on the principles of self-improvement, meditation and good health.

Asked if Falun Gong members have grown angry by years of persecution and the recent arrests, Kan said, "We do not have the concept of angry. We practice on the principle of truthfulness, compassion and forbearance -- even if they torture or beat us we will use every means to arouse their consciousness to tell them not to persecute us.

"The world does not know what has happened inside China," he added. "Jiang Zemin claimed that he would destroy us within three months, but now almost nine years have passed and we are still here."

**ushmm.org** ◀ **UNITED STATES HOLOCAUST MEMORIAL MUSEUM**

WHAT ARE YOU LOOKING FOR?  Web pages                    SEARCH | ▶

MUSEUM    EDUCATION    RESEARCH    HISTORY    REMEMBRANCE    CONSCIENCE    JOIN & DONATE

# NAZI OLYMPICS
### BERLIN 1936

*a special exhibition April 25 - August 17, 2008*

AUGUST 1936    GERMANY    SPORTS    BOYCOTT    TO BERLIN    THE OLYMPICS    THE AFTERMATH

Introduction | Site Menu | Print

## Boycott

Previous | Next

*"...Sport is prostituted when sport loses its independent and democratic character and becomes a political institution...Nazi Germany is endeavoring to use the Eleventh Olympiad to serve the necessities and interests of the Nazi Regime rather than the Olympic ideals."* —Committee on Fair Play in Sports, New York, November 15, 1935



▲ A passerby in New York City reads a notice announcing a public meeting to urge Americans to boycott the 1936 Berlin Olympics. —USHMM #21780/National Archives and Records Administration

Soon after Hitler took power in 1933, observers in the United States and other western democracies questioned the morality of supporting Olympic Games hosted by the Nazi regime. Responding to reports of the persecution of Jewish athletes in 1933, Avery Brundage, president of the American Olympic Committee, stated: "The very foundation of the modern Olympic revival will be undermined if individual countries are allowed to restrict participation by reason of class, creed, or race." Brundage, like many others in the Olympics movement, initially considered moving the Games from Germany. After a brief and tightly managed inspection of German sports facilities in 1934, Brundage stated publicly that Jewish athletes were being treated fairly and that the Games should go on, as planned.

Many American newspaper editors and anti-Nazi groups, led by Jeremiah Mahoney, president of the Amateur Athletic Union, were unwilling to be duped by Nazi Germany's hollow pledges and lies regarding German Jewish athletes. But Avery Brundage maneuvered the Amateur Athletic Union to a close vote in favor of sending an American team to Berlin, and, in the end, Mahoney's boycott effort failed.

Privacy Policy  |  Accessibility  |  Copyright



ALL-STATE LEGAL® Exhibit #6

08 0991

**FILED**

JUN - 9 2008

Clerk, U.S. District and Bankruptcy Courts



WHAT ARE YOU LOOKING FOR?   Web pages                    SEARCH | ▶

◄|UNITED STATES HOLOCAUST MEMORIAL MUSEUM

MUSEUM    EDUCATION    RESEARCH    HISTORY    REMEMBRANCE    CONSCIENCE    JOIN & DONATE

# NAZI OLYMPICS
## BERLIN 1936

*a special exhibition April 25 - August 17, 2008*

AUGUST 1936    GERMANY    SPORTS    BOYCOTT    TO BERLIN    THE OLYMPICS    THE AFTERMATH

Introduction | Site Menu | Print

## August 1936

Previous | Next



▲ The last of 3,000 runners who carried the Olympic torch from Olympia, Greece, arrives in the Lustgarten in Berlin to light the Olympic Flame and start the 11th Summer Olympic Games. — *USHMM #21674/Bettman/CORBIS*

For two weeks in August 1936, Adolf Hitler's Nazi dictatorship camouflaged its racist, militaristic character while hosting the Summer Olympics. Minimizing its antisemitic agenda and plans for territorial expansion, the regime exploited the Games to impress many foreign spectators and journalists with an image of a peaceful, tolerant Germany. Having rejected a proposed boycott of the 1936 Olympics, the United States and other western democracies missed the opportunity to take a stand that contemporary observers claimed might have restrained Hitler and bolstered international resistance to Nazi tyranny. After the Olympics, Germany's expansionism and the persecution of Jews and other "enemies of the state" accelerated, culminating in World War II and the Holocaust.

Privacy Policy    |    Accessibility    |    Copyright



WHAT ARE YOU LOOKING FOR?  Web pages                                     SEARCH | ▶

◀|UNITED STATES HOLOCAUST MEMORIAL MUSEUM

MUSEUM   EDUCATION   RESEARCH   HISTORY   REMEMBRANCE   CONSCIENCE   JOIN & DONATE

# NAZI OLYMPICS
## BERLIN 1936

*a special exhibition April 25 - August 17, 2008*

AUGUST 1936    GERMANY    SPORTS    BOYCOTT    TO BERLIN    THE OLYMPICS    THE AFTERMATH

Introduction | Site Menu | Print

## After the Games

Previous | Next

*"I'm afraid the Nazis have succeeded with their propaganda. First, the Nazis have run the Games on a lavish scale never before experienced, and this has appealed to the athletes. Second, the Nazis have put up a very good front for the general visitors, especially the big businessmen."* —Foreign correspondent William Shirer in his diary, Berlin, August 16, 1936

**"In 1940 the Olympic Games will take place in Tokyo. But thereafter they will take place in Germany for all time to come, in this stadium."** Adolf Hitler, in conversation with Albert Speer, general architectural inspector for the Reich, spring 1937

Germany emerged victorious from the XIth Olympiad. Its athletes captured the most medals overall, and German hospitality and organization won the praises of visitors. Most newspaper accounts echoed a report in the *New York Times* that the Games put Germans "back in the fold of nations," and even made them "more human again." Some even found reason to hope that this peaceable interlude would endure. Only a few reporters, such as William Shirer, regarded the Berlin glitter as merely hiding a racist, militaristic regime. As the post-Games reports were filed, Hitler pressed on with grandiose plans for German expansion. These included taking over the Olympics forever.



▲ After plans collapsed to hold the 1940 Winter Games at St. Moritz, Switzerland, Hitler gained an unexpected opportunity to return the Olympics to Germany. In June 1939, Garmisch-Partenkirchen was again named to host the 1940 Winter Olympics.



▲ In 1937, Hitler inspected architect Albert Speer's design for a stadium at Nuremberg that would host the Olympics for all time. Speer's model for a colossal, 400,000-seat stadium satisfied the Fuhrer's infatuation with monumental forms as a means of projecting German supremacy. —USHMM #15211/Courtesy of Archive of Nürnberg, Germany



WHAT ARE YOU LOOKING FOR? Web pages                SEARCH ▶



◄|UNITED STATES HOLOCAUST MEMORIAL MUSEUM

MUSEUM   EDUCATION   RESEARCH   HISTORY   REMEMBRANCE   CONSCIENCE   JOIN & DONATE

# NAZI OLYMPICS
### BERLIN 1936
*a special exhibition April 25 - August 17, 2008*

AUGUST 1936    GERMANY    SPORTS    BOYCOTT    TO BERLIN    THE OLYMPICS    THE AFTERMATH

Introduction | Site Menu | Print

## Opening of the Games

Previous | Next





On August 1, 1936, Hitler opened the XIth Olympiad. Musical fanfares directed by the famous composer Richard Strauss announced the dictator's arrival to the largely German crowd. Hundreds of athletes in opening day regalia marched into the stadium, team by team in alphabetical order. Inaugurating a new Olympic ritual, a lone runner arrived bearing a torch carried by relay from the site of the ancient Games in Olympia, Greece.

▲ Spectators in the Olympic Stadium give the Nazi salute Berlin, Germany, August 1, 1936. —USHMM #14495/National Archives, Washington D.C.

Privacy Policy   |   Accessibility   |   Copyright

# CIVIL COVER SHEET

*C* 08 991 HHK

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Ning YE, et al, pro se | George W. Buch. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF DC
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT D C
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TR.

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

NING YE    201 Mass Ave NE
#202,
Washington, DC 20002

AT
Case: 1:08-cv-00991
Assigned To : Kennedy, Henry H.
Assign. Date : 6/9/2008
Description: Admn. Agency Review

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government Plaintiff

□ 3 Federal Question
(U.S. Government Not a Party)

☑ 2 U.S. Government Defendant

□ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**□ A. Antitrust**

□ 410 Antitrust

**□ B. Personal Injury/ Malpractice**

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

**☒ C. Administrative Agency Review**

□ 151 Medicare Act

Social Security:
□ 861 HIA ((1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

Other Statutes
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
☑ 890 Other Statutory Actions (If Administrative Agency is Involved)

**□ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## . General Civil (Other) OR □ F. Pro Se General Civil

roperty
Land Condemnation
Foreclosure
Rent, Lease & Ejectment
Torts to Land
Tort Product Liability
All Other Real Property

Property
ther Fraud
uth in Lending
her Personal Property Damage
operty Damage Product Liability

y
eal 28 USC 158
drawal 28 USC 157

Immigration
□ 462 Naturalization Application
□ 463 Habeas Corpus- Alien Detainee
□ 465 Other Immigration Actions

Prisoner Petitions
□ 535 Death Penalty
□ 540 Mandamus & Other
□ 550 Civil Rights
□ 555 Prison Condition

Property Rights
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

Federal Tax Suits
□ 870 Taxes (US plaintiff or defendant

□ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational Safety/Health
□ 690 Other

Other Statutes
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC Rates/etc.

□ 460 Deportation
□ 470 Racketeer Influenced & Corrupt Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/ Exchange
□ 875 Customer Challenge 12 USC 3410
□ 900 Appeal of fee determination under equal access to Justice
□ 950 Constitutionality of State Statutes
□ 890 Other Statutory Actions (if not Administrative Agency Review or Privacy Act)

| ☐ **G.** *Habeas Corpus/ 2255*<br><br>☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **H.** *Employment Discrimination*<br><br>☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **I.** *FOIA/PRIVACY ACT*<br><br>☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions** (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **J.** *Student Loan*<br><br>☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |
|---|---|---|---|
| ☐ **K.** *Labor/ERISA (non-employment)*<br><br>☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **L.** *Other Civil Rights (non-employment)*<br><br>☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **M.** *Contract*<br><br>☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **N.** *Three-Judge Court*<br><br>☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

*Petition for Writ of Mandamus. 28 USC §1361*

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 **DEMAND $** Check YES only if demanded in complaint **JURY DEMAND:** ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) ☐ YES ☐ NO If yes, please complete related case form.

DATE *[signature]* **SIGNATURE OF ATTORNEY OF RECORD** *06/09/2008*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

\forms\js-44.wpd